UNITED STATES of America, Plaintiff,

v.

Garland Dale ROBINSON and Bradley Robinson, Defendants.

No. 80–338–Civ–J–M.

United States District Court,
M.D. Florida,
Jacksonville Division.

Aug. 26, 1983.

Ernst D. Mueller, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff.

Allen C.D. Scott, II, Donald G. Nichols, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MELTON, District Judge.

Plaintiff United States brought this civil action under the Rivers and Harbors Act, ch. 425, 30 Stat. 1148 (codified as amended in scattered sections of 33 U.S.C.) ("Rivers and Harbors Act") and the Clean Water Act, Pub.L. No. 95-217, 91 Stat. 1566 (codified as amended in scattered sections of 33 U.S.C.) ("Clean Water Act"), against defendants Garland Dale Robinson ("Garland Robinson") and Bradley Robinson. Plaintiff seeks to enjoin defendants from discharging fill material into wetlands on property adjacent to the Trout River in Jacksonville, Duval County, Florida, to compel defendants to do certain restoration work to ameliorate conditions caused by their filling activities, and to obtain a civil penalty under the Clean Water Act, 33 U.S.C. § 1319(d) (Supp.II 1978). Trial of this matter was held on December 6–9, 1982, and final arguments by counsel for the respective parties were heard on March 2, 1983. After careful consideration of the entire record herein, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. This action centers upon a parcel of property, lots 29 and 30 of the Sibley Park Addition as recorded in Plat Book 28, pages 65 and 65A of the current public records of Duval County ("lots 29 and 30"), presently owned by defendant Garland Robinson and his wife, Ernestine Robinson, located on Dolly Drive immediately north of and adjacent to the Trout River in Jacksonville, Duval County, Florida. Garland and Ernestine Robinson own and reside on lot 31, the parcel of property immediately east of the disputed property.

2. On or about June 1977, the Florida Department of Environmental Regulation ("DER") received a phone call from Garland Robinson, who reported his neighbor's nephew, James C. Newman, Jr., for filling the wetland portion of lots 29 and 30 without a permit from DER and the United States Army Corps of Engineers ("COE"). As a result of this call, officials from COE and DER investigated and notified Newman that his filling activities without a permit were prohibited by law. Consequently, Newman removed the unauthorized fill from the wetland portion of lots 29 and 30 and restored them to their prior capacity and condition.

3. On July 7, 1978, Garland Robinson acquired title to lots 29 and 30 by warranty deed and on July 13, 1978, filed a joint application with DER and COE, seeking permit authorization to conduct fill activity on the property.

4. In June 1978, the property in question was unimproved land, consisting mostly of marsh, with a strip of upland bordering Dolly Drive and with the majority of the lot covered by *Juncus roemerianus,* or black needlerush.

5. According to the testimony of Dr. William Kruczynski, a doctor of marine ecology employed by the Environmental Protection Agency, and other witnesses, the *Juncus roemerianus* wetlands that border the Trout River, of which the subject property is a part, play several vital roles in the

quality of the environment of Duval County. These vital roles include:

a. FLOOD STORAGE: These wetlands serve as natural barriers to minimize the damage to upland property, including structures located thereon, from high waters and flooding from localized storm conditions. Wave action is also reduced, thereby greatly reducing shoreline erosion.

b. WATER QUALITY: The marsh is a physical, chemical, and biological buffer system that helps improve water quality by trapping and breaking down natural and man-made pollutants before they flow into the Trout River. By filling the marsh, the area loses its ability to filter upland runoff and contributes to the deterioration of water quality in the Trout River.

c. WILDLIFE HABITAT: A *Juncus roemerianus* marsh is acknowledged to provide habitat for various wildlife, including sixty species of benthic invertebrates, several of which are important commercial species (shrimp and blue crabs).

d. NURSERY GROUNDS: Numerous species of forage and fish, including seatrout, redfish, bluefish, and mullet, utilize the marsh for feeding, spawning, nesting and refuge. The marsh provides shelter for small fish and invertebrates from predators, wave and current action, and provides the food chain necessary for their survival. The marsh is vital because it provides all the necessities small fish and invertebrates need for survival.

e. FOOD CHAIN: The marsh system provides food for wildlife that inhabits the area and the leaf litter produced by the marsh is organically broken down, providing a food source for organisms at the bottom of the food chain that inhabit the marsh. The leaf litter that is not consumed in the marsh, called detritus, is carried by the daily tide into the river where it provides a food source for fish and invertebrates. Filling the marsh removes a valuable food source for creatures that depend on detritus for their survival.

6. The Trout River is subject to the daily ebb and flow of the tide and is susceptible to navigation by vessels. The Trout River is a navigable water of the United States, which forms one of the tributaries of the St. Johns River, which in turn flows into the Atlantic Ocean.

7. In the July 13, 1978, permit application submitted by Garland Robinson, the stated purpose of the fill activity was to "improve [his] residential homesite," this reference being to Garland Robinson's adjacent homesite, because the application also stated "no structures are to be placed on [the] fill." Garland Robinson was assisted in filling out the joint application by Jeremy Tyler, a DER employee, who informed Garland Robinson that his proposed project would need both a DER and COE permit before any filling operations commenced.

8. In August 1978, even though he had not received a permit from either DER or COE, Garland Robinson placed fill material, a pollutant, on the wetland portion of lots 29 and 30, which is the subject of this action.

9. On October 4, 1978, in discussing the still pending permit application with the project manager assigned by the Jacksonville District COE, Nancy Schwall, Garland Robinson was advised not to start the filling of the property until a permit had been issued by COE.

10. Following receipt of the permit application and in accordance with federal regulations, COE prepared and mailed to various federal and state agencies and interested private persons a public notice describing the proposed work. COE received a letter dated November 11, 1978 from James Roberts, an adjacent property owner who lives on lot 28. In his letter, Roberts objected to the proposed fill project because Garland Robinson had prevented the previous owner of lots 29 and 30 from filling that property and because of environmental considerations.

11. On November 20, 1978, Garland Robinson visited COE's Jacksonville district office and received copies of federal agency

objections to the proposed fill project, as well as a copy of Roberts' letter objecting to the project. Garland Robinson was again advised that before he could engage in filling operations he must first receive a COE permit.

12. On January 16, 1979, DER issued a fill permit to Garland Robinson, which permit Garland Robinson picked up at the DER offices in Jacksonville. The DER permit authorized Garland Robinson to place fill material on the property (lots 29 and 30) up to the point "65 feet from an existing road right of way [Dolly Drive] through the middle of the property and 150 feet across."

13. In early February 1979, COE learned for the first time that actual filling had taken place on lots 29 and 30 and that more filling was occurring. On February 7, 1979, a Cease and Desist letter was sent to Garland Robinson in which COE requested that he "halt any further work in the waters of the United States, including adjacent wetlands" because such work without a federal permit is illegal. Garland Robinson admitted receiving this letter.

14. On February 12, 1979, Schwall and Victor Anderson, of COE's Enforcement Section, visited the site in question. They noted that filling operations were in progress. At that time, the filling extended out in the wetlands approximately 140 feet from Dolly Drive on the east side of lot 30 and approximately 143 feet from Dolly Drive on the west side of lot 29. Photographs were taken showing the extent of the fill and were produced at trial as Government's Exhibit No. 15, which was also admitted into evidence.

15. Review of all prefill aerial photography and inspection of the site by biologists from DER, COE and the United States Department of the Interior, Fish and Wildlife Service revealed that the site was a flooded salt marsh with a predominance of *Juncus roemerianus* vegetation. *Juncus roemerianus* is a wetland plant that requires frequent inundation or saturation by surface or ground water. The site also contained a band of *Spartina bakerii,* which is also a wetland plant that requires satu-rated soil conditions. Above the band of *Spartina bakerii* is a narrow upland area ranging from approximately 15 feet from Dolly Drive on the east side of lot 30 to 60 feet from Dolly Drive on the west side of lot 29, as depicted by line A–A on Government's Exhibit No. 21 (attached hereto as Exhibit A).

16. After receipt of the Cease and Desist letter on February 7, 1979, Garland Robinson continued to place fill material into the wetlands on lots 29 and 30 without benefit of a COE permit. Specifically, the filling was done on March 8 and 9, 1980, and May 1, 1980. On March 11, 1980, the fill extended out into the wetlands approximately 155 feet from Dolly Drive on the east side of lot 30 and 255 feet from Dolly Drive on the west side of lot 29, as shown on the photographs taken by Lawrence Evans of COE's Enforcement Section on that date (Government's Exhibit No. 18) and also depicted by line D–D on Government's Exhibit No. 21.

17. On March 23, 1979, counsel for Garland Robinson responded to COE's Cease and Desist letter on behalf of Garland Robinson and provided COE with a survey performed by a registered land surveyor showing the location of the mean high waterline (1.56 feet mean sea level), as it was found on lots 29 and 30 on December 5, 1978. The survey was admitted into evidence as Government's Exhibit No. 16. Government's Exhibit No. 21, which is a blow-up of this survey, shows the extent of fill in the wetlands, both above and below the mean high waterline.

18. By letter dated May 7, 1979, COE, in accordance with its policy, deactivated and returned Garland Robinson's permit application due to the extent of the unauthorized filling. The deactivation of the application resulted from an investigation conducted by COE's Jacksonville district office pursuant to federal regulations. *See* 33 C.F.R. § 326.3 (1982). COE determined that civil action might become necessary in order to obtain restoration, as attempts to obtain voluntary restoration from Garland Robinson had been unsuccessful.

19. On April 10, 1980, the United States filed suit against Garland Robinson and his wife, Ernestine Robinson, for violation of the Clean Water Act, 33 U.S.C., § 1311(a) (1976), and the Rivers and Harbors Act, 33 U.S.C. § 403 (1976).

20. On April 29, 1980, approximately nineteen (19) days after this lawsuit was filed, Garland and Ernestine Robinson transferred the property that was the subject of this lawsuit to Bradley Robinson, a cousin of Garland Robinson.

21. On May 29, 1980, plaintiff United States entered into a stipulation that allowed Ernestine Robinson to be dismissed from the lawsuit. The basis for this stipulation was that according to Garland Robinson he was the sole owner of the property. Subsequent to this stipulation, the United States discovered the conveyance to Bradley Robinson which was effected on April 29, 1980, and learned that Garland Robinson was not in fact the owner of the property at all when the stipulation was entered into.

22. The United States requested and was granted permission to add Bradley Robinson as a defendant in this action. Thereafter, Bradley Robinson was served with the amended complaint and made a proper party to this action.

23. Garland Robinson deposited fill materials in wetlands and below the mean high waterline on lots 29 and 30 without benefit of a COE permit. This filling activity was conducted in August 1978, February 1979, March 8 and 9, 1980, and on various other dates for the purpose of replacing an aquatic area with dry land.

24. On November 16, 1981, on the eve of the pretrial conference, defendant Bradley Robinson was deposed. At said deposition, a transcript of which was introduced at trial as Government's Exhibit No. 33, Bradley Robinson testified under oath that he was the legal owner of the property and had the ability to convey it. Bradley Robinson testified that he was aware Garland Robinson was having trouble obtaining permits for the property. Bradley Robinson also testified that the cement patio and house trailer were placed on the property,

with his knowledge, after he became the record titleholder; Bradley Robinson forwarded the money to Garland Robinson to purchase the trailer. Bradley Robinson further testified that the concrete patio was constructed over the fill by Garland Robinson after the two had discussed the matter.

25. At his deposition on November 16, 1981, although asked about his intentions concerning the property, Bradley Robinson never revealed that he was executing a warranty deed that very same day to Garland Robinson and his wife, Ernestine Robinson. The transfer resulted in Ernestine Robinson's gaining a legal interest in the property at the present time, even though she had been stipulated out of the case earlier on the ground that she allegedly had no interest in the property. In addition to actual notice of this lawsuit provided to Ernestine Robinson, notice of lis pendens was filed in this case on April 10, 1980.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter pursuant to 28 U.S.C. § 1345 (1976), and 33 U.S.C. §§ 406, 1319 (1976).

2. The Clean Water Act is a comprehensive effort by Congress "to restore and maintain the chemical, physical and biological integrity of the [n]ation's waters." 33 U.S.C. § 1251(a) (1976). In order to achieve this purpose, Congress has specifically stated that all point sources of pollutants that affect or impact upon the navigable waters of the United States shall be prohibited and regulated. Id. § 1311. 33 U.S.C. § 1311 (1976) prohibits the discharge of pollutants into navigable waters, except when in compliance with various sections of the Clean Water Act, the applicable one here being 33 U.S.C. § 1344 (1976).

3. Under 33 U.S.C. § 1344 (1976), the Secretary of the Army may issue, after notice and opportunity for a public hearing, a permit for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

4. The term "discharge of a pollutant" is defined as "any addition of any

pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12) (1976). "Pollutant" is broadly defined in the Clean Water Act as dredged spoil, solid waste, ... sewage, garbage, sewage sludge, ... rock, sand, [and] celler dirt .... *Id.* § 1362(6). The terms "dredged" and "fill material" are further defined in 33 C.F.R. § 323.2(k)–(n) (1982), which defines "fill material" as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." *Id.* § 323.-2(m). The "discharge of a pollutant" occurred when defendant Garland Robinson utilized dump trucks and bulldozers to deposit and spread fill material into wetland areas adjacent to the Trout River without benefit of a COE permit. Defendants also violated the statute when they discharged wet cement on top of the fill to create a patio for the house trailer.

5. The filling operation on lots 29 and 30 resulted in the replacement of a *Juncus roemerianus* marsh with an upland area. Such filling activity was done without the prior written authorization of the Secretary of the Army as required by the Rivers and Harbors Act, 33 U.S.C. § 403 (1976), and the Clean Water Act, 33 U.S.C. § 1344 (1976).

6. The Rivers and Harbors Act was violated when Garland Robinson, acting without a COE permit, excavated and placed fill material below the mean high waterline on lots 29 and 30, which are adjacent to the Trout River and form a part of the navigable waters of the United States. *United States v. Weisman,* 489 F.Supp. 1331, 1340 (M.D.Fla.), *aff'd,* 632 F.2d 891 (5th Cir.1980). Any excavation or filling operation conducted below the mean high waterline necessarily alters or modifies the body of water which is its subject, and plaintiff need not show an actual alteration or modification. *United States v. Weisman,* 489 F.Supp. at 1340; *United States v. Benton and Co.,* 345 F.Supp. 1101, 1102 (M.D. Fla.1972).

7. The Clean Water Act defines "navigable waters" as "waters of the Unit-

ed States." 33 U.S.C. § 1362(7) (1976). This term is to be given the broadest constitutional interpretation under the commerce clause. S.Rep. No. 1236 (Conf.Rep.), 92d Cong., 2d Sess. 114, *reprinted in* 1972 U.S. Code Cong. & Ad.News 3668, 3822; *see, e.g., United States v. Tilton,* 705 F.2d 429 (11th Cir.1983); *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir.1978); *Weiszmann v. District Engineer,* 526 F.2d 1302, 1305 (5th Cir.1976).

8. The term "[w]aters of the United States" includes "[t]ributaries to navigable waters of the United States, including adjacent wetlands." 33 C.F.R. § 323.2(a)(3) (1982); *see United States v. Lee Wood Contracting, Inc.,* 529 F.Supp. 119, 120 (E.D. Mich.1981); *United States v. Weisman,* 489 F.Supp. at 1338 ("It is ... clear that Congress intended to protect the waters of the United States in a plenary, geographic sense, and that wetlands are specifically included within that protection.").

9. "Wetlands" includes "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 33 C.F.R. § 323.2(c) (1982); *see United States v. Tilton,* 705 F.2d 429 (11th Cir.1983).

10. Plaintiff produced uncontroverted expert testimony at trial that lots 29 and 30 were predominantly vegetated by *Juncus roemerianus* (black needlerush) and *Spartina bakerii*—both wetland plant species that are located adjacent to the Trout River, a tributary of the St. Johns River—and thus form a part of the navigable waters of the United States. The uncontroverted testimony of plaintiff's witnesses showed that federal law would require a COE permit prior to placing fill material in the subject wetland portions of lots 29 and 30 and that no permit was ever obtained by defendants.

11. The Court finds that defendant Garland Robinson was aware of federal permit

requirements prior to the commencement of the fill operations. Defendant Garland Robinson even reported the previous owner for filling without a permit. Thus, Garland Robinson was aware of permit requirements prior to purchasing the property. Even after Garland Robinson received a Cease and Desist letter from COE on February 7, 1979, the fill operation on the subject lots continued not only by the addition of more fill, as revealed by Evans' visit to the site in March 1980, but also by the construction of a mobile home and concrete patio on the illegal fill.

12. In an attempt to avoid or confuse this litigation, Garland Robinson conveyed the subject property to Bradley Robinson, a relative living outside the state of Florida, by warranty deed dated April 29, 1980. Defendant Garland Robinson subsequently entered into a stipulation with plaintiff to allow for the dismissal of Ernestine Robinson on the faulty premise that defendant Garland Robinson was the sole owner of the property.

13. Once plaintiff learned of the transfer and obtained jurisdiction over the new owner, defendant Bradley Robinson, the property was conveyed by warranty deed dated November 16, 1981, back to defendant Garland Robinson and his wife, Ernestine Robinson, by defendant Bradley Robinson, in an apparent attempt to avoid the jurisdiction of COE.

14. These transfers were attempts by defendants to defeat this Court's jurisdiction in this matter and will not render the restoration remedy ordered by this Court ineffective against Ernestine Robinson, presently a titleholder of the property, as she has received both actual and constructive notice of this lawsuit prior to acquiring title to the subject property.

15. The parties have agreed that the criteria set forth in *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1301 (5th Cir.1976); *United States v. Joseph G. Moretti, Inc.,* 526 F.2d 1306, 1310 (5th Cir.1976); and *United States v. Weisman,* 489 F.Supp. 1331, 1343–50 (M.D.Fla.), *aff'd,*

632 F.2d 891 (5th Cir.1980), should guide the Court in choosing a restoration plan. The selected plan must: (1) be designed to confer maximum environmental benefits tempered with a touch of equity; (2) be practical and feasible from an environmental and engineering standpoint; (3) take into consideration the financial resources of defendants; and (4) include consideration of defendants' objections.

16. In order to remedy the federal violations that have occurred, the Court is of the opinion that the following restoration plan should be effected. Defendant Garland Robinson is ordered to restore the *Juncus roemerianus* marsh to the DER permit line. This line is depicted on Government's Exhibit No. 21 as line B–B. This restoration plan would require the removal of approximately 1,340 cubic yards of dirt at an approximate cost of $4,020, less a potential resale of the fill at approximately $1,340. In addition, the approximate cost of moving the trailer ($400) and removing the concrete patio ($120) brings the total removal cost to about $3,200. To replant this area, using 6-inch needlerush plugs, would require approximately 1,600 culms on three-foot centers at a cost of $1.25 each, for a total replanting cost of $2,000. Travel and per diem expenses of approximately $800 should be added to this figure. Therefore, the total cost of restoring and replanting the *Juncus* marsh to the DER permit line would be approximately $6,000. John Hendry, plaintiff's cost estimator, and Dr. Kruczynski testified to the accuracy of these figures at trial.

17. The Court finds this restoration plan to be practical and feasible from both an environmental and engineering standpoint. Moreover, this plan is well within the financial resources of defendant Garland Robinson, as he testified during the trial of this matter that he had $4,000 in the bank and could sell the house trailer, in which he owns a one-half interest with defendant Bradley Robinson, for between $4,000 and $5,000. Selling the house trailer would also reduce the restoration costs, as it would not have to be relocated at defend-

ants' expense. The Court is of the opinion that of the total cost of the restoration plan, defendant Bradley Robinson should only pay for one-half of the cost of removing the house trailer and concrete patio. Although Bradley Robinson was aware of Garland Robinson's activities in placing the house trailer and concrete patio on the subject property during the period of time Bradley Robinson owned said property, Bradley Robinson was merely a passive participant; it would be inequitable to order Bradley Robinson to pay for any of the costs associated with the remainder of the restoration plan. The bulk of the unlawful filling activity occurred either during Bradley Robinson's non-ownership of the subject property or without his knowledge. Although Bradley Robinson has not appeared at the trial, his deposition reveals that he has a good job and has the financial resources to assist in this portion of the restoration plan (removing house trailer and concrete patio). Consequently, defendants' objection that they are without financial means to accomplish this restoration plan is without merit.

18. Defendants contend that a successful restoration plan will require many years to fully reestablish the original "natural state" of this wetland environment. While this contention may be true, it is not persuasive. The record is abundantly clear that marshes, such as the one in the instant case, are ecologically valuable and must be protected. The fact that they may take years to fully develop cannot justify their destruction.

19. The Court, in ordering restoration below the DER permit line, is cognizant that DER issued a fill permit to Garland Robinson on January 16, 1979, to fill part of the disputed property prior to the emergence of the COE conflict. Consequently, the Court is of the opinion that it would be inequitable to order restoration above the DER permit line (depicted in Government's Exhibit No. 21 as line B–B).

20. The record is clear, however, that no authorization was ever given—either from DER or COE—to fill below the DER permit line. Indeed, defendant Garland Robinson was well aware of the need to obtain a COE permit to engage in any fill operations prior to his purchase of the property. After acquiring the property, Garland Robinson applied to COE for a permit to fill a portion of said lots. When it appeared, however, that he might not be granted a permit, he resorted to what has been termed "self help for the impatient." *United States v. Joseph G. Moretti, Inc.*, 478 F.2d 418, 427 (5th Cir.1973). Garland Robinson proceeded to begin filling the property in August 1978 and February 1979, fully aware that he had not obtained the necessary COE permit. Even after Garland Robinson received a Cease and Desist letter from COE on February 7, 1979, he proceeded to do additional filling in March and May 1980. The factual situation in this case very closely parallels the situation in *United States v. Weisman*, 489 F.Supp. 1331 (M.D.Fla.), aff'd, 632 F.2d 891 (5th Cir.1980). In both *Weisman* and the present case, defendants had the benefit of the opinions of COE experts on wetland jurisdiction prior to commencing their construction activities; defendants had the opportunity to dispute COE's jurisdiction but instead chose to indulge in "self help for the impatient." Both in the *Weisman* trial and the trial of the present controversy, defendants offered no evidence of any significant difference of opinion among botanists concerning which species of plants, shrubs, and trees are "typically adapted for life in saturated soil conditions," which is the definition relied upon by COE in asserting their jurisdiction. *See* 33 C.F.R. § 323.2(c) (1982). The volume of the restoration is due to defendant Garland Robinson's failure to heed warnings from COE to stop work. In fact, the house trailer and concrete patio were placed on top of the illegal fill after this action was filed. Defendants' claim that they were unaware of COE's concern until after all the work was done does not hold up in light of all the evidence presented.

21. Although defendants in their pretrial stipulation failed to raise the issue of a taking of private property with-

out just compensation under the fifth amendment, they attempted to raise the issue at trial. As defendants have never had a permit denied, their taking claim is not ripe for judicial relief. *See United States v. Byrd,* 609 F.2d 1204, 1211 (7th Cir.1979). Moreover, there could not be a taking of private property without just compensation in this case, because the relief requested by plaintiff merely returns the property to its condition prior to the unauthorized filling, or as it existed when defendant Garland Robinson purchased it. Further, there is no evidence that restoring the subject property to its previous condition will result in a diminution in value. However, even assuming, *arguendo,* that there will be a diminution in value after restoration, mere diminution in value is insufficient to constitute a taking under the fifth amendment. *See Deltona Corp. v. United States,* 657 F.2d 1184, 1193 (Ct.Cl. 1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

22. For the foregoing reasons, the Court orders defendants to begin the above-described restoration plan within sixty (60) days from the date of this Order. The Court, however, recognizes that the best time to replant a *Juncus* marsh is during the winter months. Consequently, defendant Garland Robinson shall not begin replanting the *Juncus roemerianus* marsh before November 1, 1983, and shall complete this replanting no later than January 1, 1984. Although civil penalties may be assessed, *see* 33 U.S.C. § 1319(d) (Supp. II 1978), the Court is of the opinion that none should be imposed, as defendants will be required to bear the sizeable cost of implementing the restoration plan outlined above.

Final judgment will be entered in accordance with these findings of fact and conclusions of law in favor of plaintiff.

## FINAL JUDGMENT

In accordance with the Court's Findings of Fact and Conclusions of Law entered this date,

1. Final judgment is hereby entered in favor of plaintiff and against defendants;

2. Defendant Garland Robinson shall restore the *Juncus roemerianus* marsh to the DER permit line (see Exhibit A attached to Findings of Fact and Conclusions of Law), using 6-inch needlerush plugs on three-foot centers. Such replanting shall be performed by an individual with expertise in replanting a *Juncus roemerianus* marsh. The restoration plan shall begin within sixty (60) days from the date of this final judgment. The replanting of the *Juncus* marsh, however, shall not begin before November 1, 1983, and shall be completed no later than January 1, 1984; and

3. Of the total cost of the restoration plan, defendant Bradley Robinson shall only pay for one-half of the cost of removing the house trailer and concrete patio.

**EXHIBIT A**