UNITED STATES of America, Plaintiff,

v.

Robert C. CIAMPITTI, Albrecht and Heun Corporation, Bruce N. Ciampitti and Pacific Four Corporation, Defendants.

Civ. A. No. 83–4004.

United States District Court, D. New Jersey.

Nov. 28, 1984.

Samuel P. Moulthrop, Asst. U.S. Atty., Jodi Lee Alper, Sp. Asst. U.S. Atty., Newark, N.J., for plaintiff.

Alfred A. Porro, Jr., Lyndhurst, N.J., for defendants Robert C. Ciampitti, Bruce N. Ciampitti and Pacific Four Corp.

GERRY, District Judge.

1. INTRODUCTION

This matter is before the court on the Government's request for a permanent injunction restraining the defendants from

engaging in fill activities at the Diamond Beach site in Cape May County, New Jersey. Also at issue is the question of whether the defendants will be required to remove the fill already placed by them on the site, and whether they will be required to restore the site to its condition prior to the inception of fill activities. Finally, the court must decide whether the imposition of civil penalties against defendants is appropriate.

The Government has proceeded under the Federal Water Pollution Control Act (Clean Water Act), the Rivers and Harbors Act, and the Refuse Act. On October 24, 1983, this court issued a temporary restraining order barring any further fill activities by defendants until the matter could be heard. A hearing on the issuance of a preliminary injunction was held November 9, 15 and 17, 1983.

By opinion dated April 2, 1984, the court issued a preliminary injunction preventing any further fill activities. *U.S. v. Ciampitti*, 583 F.Supp. 483. In that opinion, the court held that the Government had succeeded on the merits of its case under the Clean Water Act, the proofs having established that the site in question constituted wetlands, and that the defendants had discharged fill material without obtaining the required permit. All the requirements for issuance of a preliminary injunction were met. *See In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982). The defendants were invited to present "RELEVANT" evidence at a permanent injunction hearing to controvert the prior evidence on which basis we ruled that the Government had succeeded on the merits.

As to the Rivers and Harbors Act and the Refuse Act, this court held that the evidence was inconclusive as to whether any portion of the site fell below the mean high water mark and, therefore, within the jurisdiction of the Army Corps of Engineers such that a permit was necessary before fill activities could occur. The preliminary injunction, therefore, was not issued on the basis of these two Acts. However, it was clear from the evidence that the Government had the broadest jurisdiction over the site under the Clean Water Act. 583 F.Supp. at 497. That is to say, much larger areas of the site were wetlands than were arguably below the mean high water mark, and those areas arguably below the mean high water mark were in any event encompassed by the wetlands areas. Thus, success under the Rivers and Harbors Act and the Refuse Act was not crucial to the Government's application for a preliminary injunction.

A hearing on the issuance of a permanent injunction was held on May 21, June 6 and July 5, 1984.

The following shall constitute the court's findings of fact and conclusions of law.

## 2. FINDINGS OF FACT

A. The court adopts its previous findings and conclusions and incorporates them herein, with the following supplementations.

### B. *Clean Water Act*

There has been no additional evidence submitted which alters the court's finding of jurisdiction under the Clean Water Act. That is, the court continues to hold that the site in question, as described in Government Exhibits RR–5 and 100–102, contains wetlands.

### C. *Rivers and Harbors Act/Refuse Act*

The Rivers and Harbors Act, 33 U.S.C. § 403, and the Refuse Act, 33 U.S.C. § 407, extend federal jurisdiction over and, to a certain extent, beyond, the "navigable waters of the United States." The term "navigable waters," for the purposes of these statutes, means those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark. 33 C.F.R. § 322.2. Testimony was introduced at both the preliminary and permanent injunction hearings regarding the presence of territory on the site below the mean high water mark.

Of the 26.72 acres of land within the Diamond Beach site that are federal wetlands (*see* Government Exhibit 101, Government Exhibit 43), the Government claims that 1.45 acres, all within the area designated as wetlands, are below the mean high water line. (These 1.45 acres are colored in blue on Government Exhibit 101.)

Indisputably, *some* of these 1.45 acres are below the mean high water line. The defendants' witness, Gerald Speitel, conceded that some man-made ditches within the disputed area are below mean high water. Beyond these ditches, however, the evidence is less conclusive.

In order to establish the mean high water line for the Diamond Beach site, the Government's expert, Richard Rauch, had to extrapolate from tidal bench marks above and below the site, since no data was available regarding the site itself. Mr. Rauch obtained data from two tidal bench marks: Bench Mark 5838 E1977, located north of the Diamond Beach site in the vicinity of Sunset Lake, and Bench Mark 5901J, located south of the Diamond Beach site. These two bench marks were chosen because of their proximity to the site.

By using surveying methods, elevations were established for the two bench marks, and then the elevations of the tidal bench marks were related to elevations established at control points on the Diamond Beach site. Mr. Rauch determined the mean high water line on the site to approximate an elevation of 2.94 feet. However, in depicting the mean high water line on Exhibit 101, Mr. Rauch used an elevation of 3.0 feet.

Once the elevation for the site was established, the contours of the area below that elevation (3.0 feet) were made using the process of photogrammetry. This process involves the use of aerial photographs viewed through a stereoscope.

Although there was considerable testimony regarding the accuracy of the elevation established (2.94 feet) and the accuracy of the contours on the map of the site (Government Exhibit 101), this court is still not convinced that, apart from the man-made ditches, any of the land in question lies below the mean high water line. The problem, in the court's view, is with the methodology used to produce the data in question. The affidavit of defendants' expert, James P. Weidener, introduced as Defendants' Exhibit 46, concludes that the depiction of areas below the mean high water line is "flawed and subject to error." Mr. Weidener made, among others, the following criticisms of the Government's evidence. First, he stated, the tide bench marks used were not sufficiently close to the Diamond Beach site and, "more importantly," were in different bodies of water from the Diamond Beach site. Mr. Weidener stated that bench marks should have been established in Jarvis Sound, on which the property lies, because the elevations of mean high water from other bodies of water may not accurately reflect those at Jarvis Sound. Second, Mr. Weidener stated that the tidal datum epoch used in arriving at the mean high water lines for the sites north and south of the property was not the most current epoch for which data was available. The use of slightly stale data, the court infers, could have affected the accuracy of the Government's evidence. Third, Mr. Weidener stated that the use of photogrammetry in order to establish contour boundaries is inappropriate because of problems with accuracy. Finally, the court notes that the Government used a figure of 3.0 feet as the elevation for the mean high water line and made its maps in accordance with this elevation. The actual elevation the Government calculated was 2.94 feet. Although the difference is not great, the use of the 3.0 figure may nevertheless result in a finding that a larger area is below mean high water than is actually the case.

The court, based on the above criticisms of the Government's methodology, is unable to find that the Government has carried its burden with respect to the areas asserted to be below mean high water, *except for the man-made ditches*, about which there is no controversy. Somewhat less than 1.45 acres, therefore, is below the mean high water line, although, based on

the Government's exhibits, the court is not in a position to state the precise location or area of these pieces of territory.

## 3. CONCLUSIONS OF LAW

### A. *Clean Water Act—Injunctive Relief*

Having reaffirmed our finding of Corps jurisdiction under the Clean Water Act, and finding no reason to disturb our conclusions regarding the other requirements for injunctive relief, the court will permanently enjoin the discharge of fill material into the wetlands, as designated in Government Exhibits 101 and 43.

The court must briefly address the arguments raised by the defendants in opposition to this conclusion.

 First, the defendants contend that, based on a recent case out of the Sixth Circuit, the court should reconsider its conclusion that the property in question contains wetlands.

In *U.S. v. Riverside Bayview Homes,* 729 F.2d 391 (6th Cir.1984), the Sixth Circuit was faced with a case where, between the issuance and appeal of a permanent injunction, the Corps promulgated a new regulation changing the definition of "wetlands." The case was remanded for further proceedings in light of the new definition. 615 F.2d 1363 (6th Cir.1980). On the second appeal, the issue was whether the district court on remand had properly interpreted the new definition to include the property of the defendants.

The former definition of wetlands was as follows:

> those areas that are (1) periodically inundated and that (2) are normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction.

33 C.F.R. § 209.120(d)(2)(i)(h) (1976). This definition was changed, according to the Corps, to eliminate several problems. The reference to "periodic inundation" was deleted because the Corps concluded that the Clean Water Act, § 404 (33 U.S.C. § 1344), was intended to regulate discharges into the aquatic system *as it exists,* not as it may have existed over a record period.

729 F.2d at 395. Furthermore, "normally" was replaced by the phrase "under normal circumstances do support." This change was adopted, in part, to make clearer that excluded from Corps jurisdiction are those areas that are not aquatic but experience an abnormal presence of aquatic vegetation. *Id.* at 396, and also to make clearer that man-made obstructions to the flow of water, such as tidal gates (as are present here) would not exempt a site from Corps jurisdiction. *Id.* Thus, the new, and present, definition of wetlands is as follows:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

33 C.F.R. § 323.2(c) (1983).

In construing this newer definition, the *Riverside* court stated as follows:

> The new regulation makes clear that it is the present occurrence of inundation or flooding sufficient to support wetlands vegetation, *not the mere presence of such vegetation from some other cause,* that determines whether a particular area is wetland.... Neither inundation nor aquatic vegetation would be sufficient, standing alone, to bring a piece of land within the definition. Both must be present, *and the latter must be caused by the former.*
>
> Were this not so, then areas which inexplicably support some species of aquatic vegetation, but which are not normally inundated, would fall within the wetlands definition. Such a perverse result could not have been what the Corps contemplated.... Indeed, as noted earlier, the Corps expressly adverted to the situation of "areas that are not aquatic but experience an abnormal presence of aquatic vegetation" and emphasized that such lands were not intended to be covered by the regulations.

729 F.2d at 396 (emphasis added).

In holding that the lands in that case were not wetlands, the *Riverside* court not-

ed that the lands, although arguably "periodically inundated" (in accordance with the previous wetlands definition), were not presently inundated. The presence of the vegetation was "abnormal," and attributable not to the few present instances of flooding, but to the type of soil on the property. *Id.* at 397.

This court has some reservations about the Sixth Circuit's construction of the regulation at issue, although it has no problem with that construction as applied to the facts of that case. We find, however, that the facts of the instant case clearly support Corps jurisdiction, even under the *Riverside* test. In our previous opinion, we found as follows:

> The soil in the federally designated wetlands at the site is saturated throughout, in most cases directly to the surface.
>
> . . . .
>
> During normal high tide conditions, surface water covers a majority of the site. . . .
>
> . . . .
>
> Vegetation on the site which indicates a wetlands environment includes: marsh hay, salt marsh cordgrass, high tide bush, salt marsh fleabone, black grass, and sea myrtle. These plants are commonly found in New Jersey salt marshes and are adapted to an area subject to tidal flow.

583 F.Supp. at 489. We further concluded:

> The Government has proven ... that the site ... has an abundance of ... plants *requiring* a saturated environment to survive. . . .

*Id.* at 492 (emphasis added). This court believes that its findings indicate the presence of areas inundated by surface or ground water, the presence in those areas of a prevalence of vegetation typically adapted for life in saturated soil, and that such findings support the conclusion that

the latter circumstance is caused by the former.

In considering "causation" under this regulation, this court does not believe the Sixth Circuit announced a test whereby it becomes necessary to rule out any and every possible cause for the existence of aquatic vegetation other than frequently saturated soil. This would be an impossible test, it would seem. Rather, this court believes the Sixth Circuit was speaking of causation in a somewhat looser sense, whereby by the presence of frequently saturated soil would ordinarily be taken as the "cause" of the vegetation, absent some peculiar circumstance indicating another cause.

In this case, the court has found the presence of both saturated soil and aquatic vegetation; and absent any evidence to indicate that, under the circumstances, the presence of the vegetation is, in some sense abnormal, the court concludes that the soil saturation "causes" the growth of the vegetation. This is not the "perverse" case to which the Sixth Circuit alludes wherein, even absent the regular presence of soil saturation, aquatic plants are nevertheless abundantly present.[1] In such a case it obviously becomes necessary to look for the explanation of the growth in other factors beside the presence of surface or ground water. Here, there is no need to look any further.

Accordingly, our finding of Corps jurisdiction is not disturbed by the *Riverside* decision.

The court further notes that the fact that we cannot quite conclude that much of the land is below mean high water does not indicate, as defendants argue, that it is not saturated by surface *or ground water.*

The defendants' second challenge to the issuance of a permanent injunction is one previously raised and disposed of, but which we will reiterate. This is the "taking" issue.

---

**1.** The presence of typically wetlands vegetation slightly beyond the boundaries designated in Government Exhibit 101 probably merely indicates that the Government's designation is conservative.

The defendants state that the assertion of Corps jurisdiction over the property, combined with the injunction against further discharges onto the property, amounts to a taking for which compensation must be paid.

■ The first problem with this argument is that neither of the defendants *who have answered* the complaint (that is, neither Robert Ciampitti nor Albrecht and Heun) is, on the record, a property owner. These defendants, therefore, lack standing to even raise the issue. We only address the issue further because counsel for Robert Ciampitti entered an appearance for Bruce Nicholas Ciampitti and Pacific Four Corporation. Bruce Nicholas Ciampitti, at least, owns some of the property and has standing to raise the issue (although, to do so, he should have filed an answer and counterclaim). Whether a taking claim may even properly be brought in this court, however, is doubtful. If the taking claim exceeds $10,000, jurisdiction is exclusive in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491. *American Dredging Co. v. Dutchyshyn*, 480 F.Supp. 957 (E.D.Pa. 1979), *aff'd* 614 F.2d 769 (3rd Cir.); *Bayou des Familles Development Corp. v. U.S. Corps of Engineers*, 541 F.Supp. 1025 (E.D.La.1982).

■ Furthermore, as this court stated in its previous opinion, the issue is, in any event, premature until a permit is applied for and denied. The defendants argue that, if applied for, a permit will most certainly be denied. However, any informal predictions by Corps personnel can hardly take the place of a formal denial following a formal submission in compliance with the application requirements of 33 C.F.R. § 325. The fact remains that no permit application has yet been processed, and the taking issue is premature. *See Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 927 (5th Cir.1983); *U.S. v. Byrd*, 609 F.2d 1204 (7th Cir.1979).

The defendants have introduced letters (Defendants' Exhibit 32) which purport to demonstrate that the Corps has been unwilling to meet with them to discuss a possible permit application. It may well be that the Corps at this juncture will not talk to Mr. Ciampitti. *See* 33 C.F.R. § 326.-3(c)(4) and footnote 2 (where Clean Water Act violation is of a nature that complaint is recommended to be filed by U.S. Attorney, after-the-fact permit application should not be accepted until the enforcement action is resolved). This fact still does not convert the Corps assertion of jurisdiction into a taking but further highlights the prematurity of the claim.

Finally, of course, we note that the mere assertion of jurisdiction and the injunction against filling may or may not ultimately, on the merits, amount to a taking. *See, e.g., Deltona Corp. v. U.S.*, 657 F.2d 1184, 228 Ct.Cl. 476 (1981); *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

In sum, then, the taking argument has no bearing on our conclusion in favor of an injunction. (Of course, the mere fact that property is "taken" only requires that compensation be paid; nothing *prevents* the Government from taking the property by preventing development.)

To repeat, then: the defendants are hereby permanently enjoined from engaging in fill activities on those portions of the site designated as wetlands.

### C. Rivers and Harbors Act/Refuse Act—Injunctive Relief

Above, we found that the man-made ditches on the Diamond Beach site were below the mean high water line. Even though man-made, these ditches are nonetheless subject to Corps jurisdiction. *See* 33 C.F.R. § 329.8(a)(1) (determination of navigability not limited to natural or original condition of waterbody; a canal or other artificial water body that is subject to ebb and flow of the tide is a navigable water); *see also* 33 C.F.R. § 329.13(b). Therefore, as to these ditches, a permanent injunction against fill activities is warranted under either 33 U.S.C. § 403 or § 407. However, at this juncture, such an injunction is unnecessary, since the permanent

injunction against filling the wetlands already encompasses any activities in these ditches. Moreover, the court at this time lacks a clear survey or metes and bounds description of the ditches such as would make it possible to appropriately fashion an injunctive order. Accordingly, no injunction specifically directed to the man-made ditches will issue at this time.

The Government has apprised the court of case law indicating that jurisdiction under these Acts may extend even beyond the mean high water line, where activities shoreward of the line may have an impact on navigable waters below the line. *See U.S. v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1297–99 (5th Cir.1976); *U.S. v. Moretti*, 526 F.2d 1306, 1310 (5th Cir.1976); *U.S. v. American Cyanamid Co.*, 480 F.2d 1132, 1135 (2d Cir.1973); *U.S. v. Esso Standard Oil Co.*, 375 F.2d 621, 623 (3d Cir. 1967).

Thus, an injunction under these Acts to prohibit fill activities in close proximity to the ditches may be warranted, as fill placed on the banks of, or near, the ditches may erode into the ditches. However, for the reasons given above with respect to the ditches themselves, no injunction specifically directed to fill near the ditches will issue at this time. The injunction we issue with respect to the entire wetlands is sufficient to address the concerns of the Government under all the Acts under which suit was brought.

D. *Restoration Plan*

█ The Government seeks an order requiring the defendants to remove all fill placed within the wetlands area and to return the site to its natural state by planting wetlands vegetation and restoring waterways.

There can be no doubt that this court has the power under the Clean Water Act to order the restoration proposed by the Government. *See U.S. v. Robinson*, 570 F.Supp. 1157 (M.D.Fla.1983); *U.S. v. Outboard Marine Corp.*, 549 F.Supp. 1036, 1043 (N.D.Ill.1982); *U.S. v. Weisman*, 489 F.Supp. 1331 (M.D.Fla.1980); *O'Leary v. Moyer's Landfill*, 523 F.Supp. 642 (E.D.Pa. 1981).

The defendants argue, however, that the Government has failed to justify, either procedurally or substantively, its proposed plan. The defendants rely on *U.S. v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1301 (5th Cir.1976) and *Weisman, supra.* The *Weisman* court, expanding on the language in *Sexton Cove Estates*, stated:

[T]here are two prerequisites to be satisfied before any consideration of the restoration plan itself: (1) the court must have jurisdiction over the portion of the property or activity to be directly affected by the restoration plan, and (2) the court must conduct a hearing in which the merits, demerits, and alternatives to the restoration plan are fully developed.

489 F.Supp. at 1342–43. Here, based on the above findings of fact and conclusions of law, there can be no doubt that this court has jurisdiction over the affected portion of the site. As to the hearing requirement, there is nothing in the case law to suggest that the hearing on the restoration plan be a hearing separate and apart from, or subsequent to, the hearing on the merits (the hearing to determine whether the Act was violated). In the *Weisman* case itself, no separate hearing took place. 489 F.Supp. at 1343. Therefore, this court finds nothing procedurally inappropriate about ordering restoration on the present record.

The *Weisman* court elaborated as well on the criteria to be applied in evaluating a proposed restoration plan.

The selected plan must: (1) confer maximum environmental benefits, (2) be achievable as a practical matter, and (3) bear an equitable relationship to the degree and kind of wrong it is intended to remedy.

489 F.Supp. at 1343. The Government's proposed plan is actually merely a set of guidelines. The Government would have the defendants submit a more detailed plan, subject to approval or modification by the Corps of Engineers. Nevertheless, there is enough in these guidelines to per-

mit this court to evaluate the plan's appropriateness.

These guidelines require: that all fill be removed and that the defendants identify the location where such removed fill will be taken; that the area be replanted with plant species found adjacent to the areas of fill removal; and that waterways be restored. Further, the Government would have the defendants submit an implementation schedule, prepare a post-restoration monitoring program, and have the defendants engage an outside consultant to actually prepare and implement the program.

In opposition to the Government's proposal, the defendants apparently take the position that there should be *no* restoration; that is, that the site should be left as it is. The defendants' position is based on rather vague allegations that restoration would have an adverse impact on the environment insofar as it would destabilize partially completed sewer and utility systems in the area and result in an economic loss to both public and private investors in these utility and sewer lines. The court has scrutinized the record in this case and finds little evidence to support these allegations, other than the evidence that the defendants themselves will suffer economic loss.

In evaluating whether a proposed restoration plan will confer maximum environmental benefits, it is necessary to consider the environmental importance of the wetlands on the site as well as the harm caused by the defendants' activities. Congress and the Corps of Engineers, through its regulatory authority, have taken the position that wetlands serve important environmental functions:

> Some wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest....
> Wetlands considered to perform functions important to the public interest include: ... wetlands which serve significant biological functions, including food chain production, general habit, and nesting, spawning, rearing and resting sites for aquatic or land species; ... wetlands which are significant in shielding other areas from wave action, erosion, or storm damage; ... wetlands which serve as valuable storage areas for storm and flood waters ... and wetlands which serve significant and necessary water purification functions.

33 C.F.R. § 320.4(b). In the court's findings of fact in connection with the issuance of a preliminary injunction, we found that the wetlands on the Diamond Beach site perform all the vital functions enumerated above. 583 F.Supp. at 490. We further found that the ability of these wetlands to perform these vital functions was hindered by the defendants' activities. *Id.* It stands to reason that the return of the wetlands area to its undeveloped state would confer maximum environmental benefits. At best, the defendants' protestations to the contrary are speculative, and the only remedy they offer is that of doing nothing, which is unacceptable. *Cf. Weisman, supra,* at 1347.

In evaluating the practicality of a proposed restoration, we must consider its feasibility and cost-effectiveness. *Id.* at 1348. There is nothing in the record to suggest either that the fill could not be removed or that vegetation could not be replanted. Of course, whether the replanted vegetation will survive is uncertain. In other circumstances, however, this has not barred a proposed replanting. *See Weisman, supra,* at 1347 (restoration of forest ordered, although full recovery would take from 10 to 30 years). In considering cost-effectiveness, we realize that we lack some information that might be useful: the financial resources of the defendants and an estimate of the cost of the restoration plan. *Cf. U.S. v. Robinson, supra,* at 1164–65. But here, the indefiniteness of the Government's proposal is actually a virtue. The defendants, so long as they are faithful to the goals of the plan, will have considerable independence and will be able to do what they feel is desirable to minimize the

cost of restoration. Therefore, the court is not overly troubled by certain lacunae in the record, especially given the equitable considerations applicable here. *See infra.*

Finally, turning to the equities of this case, we find that the defendants, with one exception, are not in a strong position to argue equity. As this court has found previously, as early as 1980 the defendants were aware of wetlands regulations and the possibility that Diamond Beach was within the jurisdiction of the Corps. In September 1983, the defendants acted in defiance of a "cease and desist" order of the Corps. 583 F.Supp. at 486, 487. Even after this court issued its preliminary injunction in April 1984, the defendants did not cease their fill activities, and Robert Ciampitti was cited for contempt in September, 1984. Even after that, fill activities continued on the site. Thus the equities do not weigh in the defendants' favor.

However, this court believes that the defendant Albrecht and Heun is in a better position to make an equitable argument. The record indicates that this defendant was merely a construction company which acted at the instance of the other defendants, and that its role was more or less passive. Moreover, this defendant does not appear to have a continuing interest in the site. Accordingly, Albrecht and Heun shall be excluded from this court's restoration order.

In sum, then, the court adopts the restoration plan proposed by the Government. We shall retain jurisdiction to resolve any disputes which may arise in either the preparation or implementation of the plan.

Finally, we must address the timing of the plan. We believe that restoration should occur as soon as possible. However, it seems both wasteful and unfair to the defendants to order restoration to proceed while there exists the possibility that the development of the Diamond Beach may be approved by the Corps. Therefore, the court will stay the *implementation* of the restoration plan on the following conditions:

A. The defendants shall, within 45 days of the accompanying order, apply for a permit to engage in fill activities at the site.

B. If the defendants have not applied for a permit within 45 days of the order, then implementation of the plan shall proceed as scheduled in the order. Furthermore, if the defendants' permit application is returned for failure to meet the requirements of 33 C.F.R. § 325.1, then implementation shall proceed as scheduled in the order.

C. If defendants submit a proper application within 45 days of the accompanying order, then implementation of the restoration plan will be stayed pending a decision by the Corps on the application.

Of course, if the Corps grants the permit, the injunction and restoration order will be vacated or modified as is appropriate. The stay conditions provided above only apply to the implementation phase of the restoration plan. The defendants will be required to *prepare* a plan within 60 days of the accompanying order.

### E. *Civil Penalties*

The Government seeks the imposition of civil penalties against Robert Ciampitti only. Holding only this defendant liable is appropriate, given the statement of his attorney that he is the party responsible for the activities on the site and all the evidence consistent with this conclusion. This defendant clearly violated sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1344, on at least 15 separate days (including those violations occurring after the court's order of April, 1984). Section 309(d) of the Act, 33 U.S.C. § 1319(d), authorizes imposition of a penalty of up to $10,000 for each day on which a violation occurs. The Government urges that the flagrancy of Ciampitti's conduct warrants a substantial penalty.

The court does not entirely disagree. However, the question of penalties will be held in abeyance pending the preparation and implementation (if necessary) of the restoration plan. We believe this course is appropriate because it is more important

that the site be restored than that the defendant Robert Ciampitti be punished. To the extent that Robert Ciampitti is not a person of unlimited resources, the court prefers that his resources be initially spent on clean-up of the site. *Cf. O'Leary, supra.* Furthermore, defendant Robert Ciampitti's good faith in preparing and implementing a restoration plan is a relevant factor in assessing the size or necessity of civil penalties.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).