**UNITED STATES of America, Plaintiff,**

v.

**Robert C. CIAMPITTI, Albrecht and Heun Corporation, Bruce N. Ciampitti and Pacific Four Corporation, Defendants.**

Civ. A. No. 83–4004.

United States District Court, D. New Jersey.

Sept. 22, 1987.

---

U.S. Atty. Thomas W. Greelish by James C. Woods, Sp. Asst. U.S. Atty., Newark, N.J., for plaintiff.

Porro and Porro by Alfred A. Porro, Jr., Lyndhurst, N.J., for defendant Robert C. Ciampitti.

## OPINION

GERRY, District Judge.

This matter comes before this court on an application by the plaintiff for an order adjudging the defendant Robert C. Ciampitti in contempt of a permanent injunction issued by this court on November 28, 1984, imposing a coercive monetary penalty to induce the defendant's compliance with that order, and for an order imposing substantial civil penalties under the Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. § 1251, *et seq.* The court conducted an extensive hearing on this motion on March 30 and 31 and April 2, 3 and 9, 1987. The following constitutes the court's findings of fact and conclusions of law in accordance with F.R.Civ.P. 52(a). The court also adopts and incorporates herein the findings and conclusions previously made in this case.

Plaintiff brought this action seeking injunctive relief against defendants Robert C. Ciampitti and Pacific Four Corporation, the developers of the Diamond Beach site in Cape May County, New Jersey, prohibiting them from engaging in fill activities in federally regulated wetlands at the site. The parties previously stipulated that Robert C. Ciampitti is the principal defendant— "the one responsible for having conducted the activities at the site." *U.S. v. Ciampitti,* 583 F.Supp. 483, 485–486 (D.N.J.1984). On April 2, 1984, this court issued a preliminary injunction restraining the defendant from engaging in further fill activities at the site. By order dated September 27, 1984, the defendant was adjudged to be in contempt of that order, after it was determined that he placed further fill in the restricted area. On October 18, 1984, the plaintiff again instituted contempt proceedings, alleging that the defendant had further violated the injunction by placing concrete sidewalks in the wetlands. These proceedings led to a November 26, 1984 consent order which provided for removal of the sidewalks and for a civil fine of $1500. for each day on which additional material was placed in the wetlands.

On November 28, 1984, this court entered an order permanently enjoining the defendant from discharging fill material into the wetlands. *U.S. v. Ciampitti,* 615 F.Supp. 116 (D.N.J.1984), *aff'd,* 772 F.2d 893 (3d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). The order further provided that the defendant must remove all fill material placed in the wetlands and designated in yellow on the control map, Gov. Ex. 101, within 75 days. In addition, the order directed the defendant to submit to the Corps of Engineers, within 60 days, a proposed plan for restoration and planting of the area from which fill was removed, and to implement the plan within 45 days after approval by the Corps. The order provided, however, for a stay of the fill removal and restoration pending submission by defendant of an application to the Corps pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344, for a permit to engage in fill activities at the site. The permit application was to be submitted within 45 days. At the same time, we denied, without prejudice, plaintiff's application for the imposition of civil penalties against defendant Ciampitti. We noted that the defendant had violated sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1344 on at least 15 separate days. However, we held the issue of penalties in abeyance pending

defendant's submission of a restoration plan, reasoning that the defendant's "good faith in preparing and implementing a restoration plan is a relevant factor in assessing the size or necessity of civil penalties." 615 F.Supp. at 125. This court's November 28, 1984 order was affirmed by the Third Circuit on August 29, 1985.

Subsequent to the issuance of the permanent injunction, on January 10, 1985, Gerald E. Speitel Associates (Speitel Associates) submitted, on behalf of defendant Ciampitti, an application for a Department of the Army permit to place fill material, maintain existing unauthorized fill material, and undertake other activities in the federally regulated wetlands. (Testimony of Barry Gale, p. 24, lines 14–17.) On January 28, 1985, Speitel Associates submitted a proposed restoration plan for the Diamond Beach site. (*Id.* at p. 21, lines 212–15; Gov.Ex. 3.) By letter dated May 8, 1985, the Corps notified Speitel Associates that the restoration plan was unsatisfactory, and that certain specific revisions would be required in order to obtain Corps approval. (*Id.* at p. 22, lines 17–25; p. 23, lines 1–21; Gov. Ex. 4.) On June 5, 1986, defendant's permit application to develop the Diamond Beach site was denied by the Corps. (*Id.* at p. 25, lines 1–13, Gov.Ex. 5.) The letter denying defendant's application also directed him to submit a proposed revised restoration plan within 30 days. (Gov.Ex. 5.)

Plaintiff filed the present motion on January 28, 1987. It seeks an order adjudging the defendant to be in contempt of this court's permanent injunction order, and imposing coercive sanctions to compel future compliance, and an order finding the defendant to be in violation of the Clean Water Act and imposing civil penalties. We will address these issues in turn.

## 1. *Contempt*

█ Courts have inherent power to hold parties in civil contempt in order "to enforce compliance with an order of the court or to compensate for losses or damages." *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

A party seeking to have another held in contempt must demonstrate, by clear and convincing evidence, that the respondent violated a clear and unambiguous court order. *See United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984). "The relevant inquiry in a civil contempt proceeding is whether the defendants took 'all the reasonable steps within their power to insure compliance with the orders.'" *Halderman v. Pennhurst State School and Hospital,* 526 F.Supp. 414, 422 (E.D.Pa. 1981), *quoting Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9th Cir.1976). Moreover, "[o]nce a *prima facie* showing of violation has been made, the respondent can defend his failure on the grounds that he was unable to comply.... To succeed on this defense, however, the respondent must go beyond a mere assertion of inability and satisfy his burden of production on the point by introducing evidence in support of his claim." *United States v. Hayes, supra,* at 725 (citations omitted).

In the present case, the November 28, 1984 order of this court required the defendant to remove the fill and to implement a restoration plan within 75 days of the denial, by the Corps, of his application for a permit to engage in fill activities at the site. The order also permanently restrained and enjoined the defendant from placing further fill material in the federally regulated wetlands at the site. In addition, under the consent order entered into by the parties on November 26, 1984, the defendant was required to remove the sidewalks constructed on Memphis Avenue and Rochester Avenue within the area of federal jurisdiction. The plaintiff contends that the defendant is in violation of all aspects of these orders.

### a. *Removal of fill and restoration of site.*

It is undisputed that defendant Ciampitti has not removed any of the fill that he placed at the Diamond Beach site. (Testimony of Robert Pacione, p. 121, lines 1–18; testimony of Robert Ciampitti, p. 502, lines 10–25; p. 503, lines 1–16; p. 538, lines 19–20; p. 541, lines 24–25.) In addition,

after the denial of the permit, the Corps twice requested the defendant to comply with the court's order by submitting a revised restoration plan for approval. (Testimony of Gale, p. 29, lines 16-25; p. 35, lines 1-13; Gov. Ex. 6 and 8.) To date, defendant has not submitted a revised restoration plan. (*Id.* at p. 23, lines 22-25; p. 24, lines 1-2; p. 38, lines 3-6.) Based on these facts, we find that the plaintiff has made a *prima facie* showing of defendant's non-compliance with the removal and restoration aspects of this court's November 28, 1984 order.

### b. *Additional filling.*

The plaintiff also contends that the defendant has engaged in additional fill activities in the federally regulated wetlands at Diamond Beach, in violation of this court's prohibitory injunction.

### *Additional paving.*

On December 7, 1984, Corps inspector Robert Pacione performed an inspection at the Diamond Beach site. At that time, he observed that additional paving—namely, extensions of Memphis and Rochester Avenues—had been placed in the federal wetlands. (Testimony of Pacione, p. 87, lines 2-15; Gov. Ex. 11 and 13.) Defendant admitted that he was responsible for placing the additional blacktop on the roads in the wetlands, and that he had not removed it. (Testimony of Ciampitti, p. 541, lines 8-25.) Accordingly, we find that the plaintiff has satisfied its *prima facie* burden of demonstrating that the defendant has violated the permanent injunction by placing this additional fill in the wetlands.

### *Boat dock and ramp.*

On August 29 and September 30, 1985, Pacione performed another inspection at the Diamond Beach site. He observed that since the date of the court's order, a concrete boat ramp, dock and pier had been constructed in the southwesterly portion of the Diamond Beach site. (Testimony of Pacione at p. 94, lines 15-16; p. 98, lines 10-16; p. 99, lines 10-25; Gov. Ex. 14 and 15.) Defendant Ciampitti placed the structures there in the late winter or early spring of 1985. (Testimony of Ciampitti, p. 464, lines 4-7.) The concrete ramp is approximately 12' wide and 67' long and is located almost entirely in the federal wetlands delineated on Gov. Ex. 101. (Testimony of Pacione, p. 98, lines 12-22; testimony of Ciampitti, p. 468, lines 23-25; p. 469, lines 1-2; testimony of William Dailey, p. 63, lines 14-17; Gov. Exs. 11, 14 and 15.) In fact, the ramp was built on top of fill previously placed in the wetlands by Ciampitti. (Testimony of Ciampitti, p. 467, lines 12-16.) The dock and pier appear to be wooden structures. (Gov. Ex. 16.) They are located immediately southwest (to the exterior) of the survey closure line on Gov. Ex. 101. (Testimony of Pacione, p. 92, lines 22-25; p. 93, lines 1-10; p. 99, lines 10-18; Gov. Ex. 11, 14, 15 and 16.) At the hearing, there was a dispute as to whether the land southwest of the survey closure line falls within the area of federal wetlands jurisdiction, and whether our November 28, 1984 order clearly prohibited the defendant from engaging in fill in that area outside of the survey closure line.

We find, based on the evidence adduced at the hearing, that the plaintiff has met its *prima facie* burden of showing that the defendant violated this court's order by placing additional fill, in the form of a concrete ramp and a portion of the dock and pier structure, in the restricted wetlands area. We also believe, however, that our order was ambiguous with respect to imposing restrictions on the defendant's fill activities outside of the survey closure line, and therefore we find that he cannot be held in contempt for placing portions of the dock and pier structure outside of that line.

### *Block 706, Lots 5, 6, 33 and 34.*

On January 12, 1987, Corps Inspector Pacione observed that fill material had been placed in the wetlands between Memphis Avenue and Rochester Avenue directly adjacent to two residential structures identified as 105/107 Memphis Avenue (block 706, lots 5 and 6) and 104/106 Rochester Avenue (block 706, lots 33 and 34) that were under construction. (Testimony of Pacione, p. 104, lines 8-23; Gov. Ex. 11, 12 and 19.) The CMD partnership, in which defendant Ciampitti has a 50% interest, ac-

quired these properties in the summer of 1986. (Testimony of Ciampitti, p. 456, lines 24–25; Def. Ex. 13 and 16.) Defendant Ciampitti then undertook construction of the duplex structures presently at the site. (Testimony of Ciampitti, p. 492, lines 4–7 and lines 16–19.) A portion of the wooden deck attached to the structure at 104/106 Rochester Avenue extends into the wetlands by a distance of one foot. A portion of the structure at 105/107 Memphis Avenue extends into the wetlands by a distance of 3.98 feet, and the deck attached to that structure extends into the wetlands by a distance of 10.21 feet. (Testimony of Dailey, p. 67, lines 7–21.) The fill adjacent to these structures extends into the regulated wetland area by approximately 18–20 feet. (Testimony of Dailey, p. 68, lines 16–18.) Based on this evidence, we find that the plaintiff has made a *prima facie* showing that the defendant has violated this court's order by placing additional fill in the wetlands in the vicinity of block 706, lots 5, 6, 33 and 34.

*Block 711, Lots 1 and 2.*

On January 12, 1987, Corps Inspector Pacione observed that fill material had been placed, and a residential structure identified as 100 and 102 Memphis Avenue (block 711, lots 1 and 2) had been constructed on the corner property northwest of the intersection formed by Memphis and New Jersey Avenues. (Testimony of Pacione, p. 104, lines 6–13; p. 105, lines 3–17; Gov. Ex. 12 and 19.) The southwest corner of the structure located on this land encroaches into the wetlands by 5.93 feet, and the wood deck attached to the structure extends over the federal jurisdictional line by a distance of 13 feet. (Testimony of Dailey, p. 67, lines 22–25; p. 68, line 1; Gov. Ex. 11 and 12.) The fill associated with that structure extends into the wetlands by 27 feet. (Testimony of Dailey, p. 68, lines 11–19; testimony of Ciampitti, p. 523, lines 11–15; Gov. Ex. 11 and 12.)

The CMD partnership acquired block 711, lots 1 and 2, in the winter or spring of 1986. (Testimony of Ciampitti, p. 459, lines 13–16; p. 460, lines 23–23; Def. Ex. 28.) Ciampitti originally intended to construct a duplex on the property with an angled corner to accommodate the wetlands line that runs through the southwest corner of the property. (Testimony of Ciampitti, p. 477, lines 6–25, p. 478, line 1–17; Def. Ex. 5.) However, his mason installed a "false corner" in order to improve the structure's appearance. (Testimony of Ciampitti, p. 480, lines 1–24; p. 481, lines 8–13; Gov. Ex. 19, photo 3–5.) Although he was aware that the structure intruded upon the wetlands, the defendant did not remove the "false corner." (Testimony of Ciampitti, p. 482, lines 19–25; p. 483, lines 1–5.) Instead, he sold the property and duplex to Mr. and Mrs. Raymond Rotella and Mr. and Mrs. Seymour Roth, without first informing them that the land and structure encroached on federal wetlands. (Testimony of Rotella, p. 213, lines 16–25; testimony of Roth, p. 241, lines 15–23.) The wetland jurisdictional line passes through the Rotellas' dining room. (Testimony of Rotella, p. 228, lines 17–18.)

Prior to their purchase of 102 Memphis Avenue, the Rotellas were informed by William Ciampitti, a real estate agent for CMD partnership, that their deck would have an unusual shape due to certain local setback restrictions. They were not informed that the real reason for the deck's shape was the existence of the federal wetlands line on the property. (Testimony of Rotella, p. 215, lines 16–25; p. 216, lines 1–18; Def. Exs. 47 and 48.) The Rotellas later learned that the setback restrictions would not bar an addition to the deck, and thereby unknowingly expanded their deck into the wetlands area. (Testimony of Rotella, p. 223, lines 10–21.)

Based on this evidence, we find that the plaintiff has made a *prima facie* showing that the defendant violated this court's order by placing additional fill; namely, a corner of the structure at 102 Memphis Avenue and the fill associated with that structure in the wetlands. We find that the defendant is not responsible for the additions to the deck at 102 Memphis Avenue which encroach on the federal wetlands. However, as discussed more fully below, we find that his concealment from the new property owners of the existence

of federal wetlands on block 711, lots 1 and 2, is highly relevant to the issue of his good faith in attempting to comply with this court's order.

### c. *Removal of sidewalks.*

It is undisputed that the defendant has failed to remove the sidewalks as required by the November 26, 1984 consent order. (Testimony of Ciampitti, p. 538, lines 19–20; p. 539, lines 14–15.) Accordingly, we find that the plaintiff has made a *prima facie* showing of defendant's violation of the consent order.

### d. *Defenses.*

We now turn to a consideration of the reasons offered by the defendant for his non-compliance with this court's order in the ways just enumerated. Initially, we will briefly dispose of several of the proffered defenses that we find to be utterly meritless. At the hearing, the defendant introduced considerable evidence concerning the presence of garbage in the federally regulated wetlands. (*See, e.g.,* testimony of Gary Paul Franklin, pp. 274–278; Def. Ex. 29.) One purported explanation for the introduction of this evidence was to establish that the defendant was not responsible for the placement of the garbage in the wetlands, and that it would be difficult for him now to remove it. Under this court's November 28, 1984 order, however, the defendant was obligated only to remove fill and to restore areas shaded in yellow on Gov. Ex. 101, and therefore those are the only areas, with respect to defendant's removal and restoration obligations, that are relevant to the present proceedings. A comparison of Gov. Ex. 101 with Def. Ex. 29 (which denotes areas containing trash) reveals that very few of the areas to which defendant's removal and restoration obligation extends contain garbage. More importantly, the court has already determined that the defendant must remove fill and restore the areas shaded in yellow on Gov. Ex. 101, and that determination was embodied in an order that was affirmed on appeal. If those areas contain garbage, then the defendant was and is obligated to remove it. We will not now allow relitigation of the wisdom or validity of the underlying final order issued by this court.

Defendant also points to the existence of garbage at the site in the hope of convincing this court that the area is of "nominal environmental value," (Defendant's Proposed Findings of Fact and Conclusions of Law, pp. 30–31), and that his noncompliance with this court's order is thereby excused. We find it incredible that the defendant is still raising this argument at this stage in the litigation. The court has already found that the wetlands area at issue here is of significant environmental value. Defendant's opinion to the contrary is no defense for his failure to comply with the court's order.

Defendant also argues that certain distortions in Gov. Ex. 101 prevented him from accurately locating the limits of the federal wetlands in the field and thereby from complying with this court's order. According to the testimony of Gerald E. Speitel, a land surveyor, the Corps' jurisdictional line as laid out on Gov. Ex. 101 does not correspond exactly with its legal description. (Testimony of Speitel, p. 432, lines 17–23; Def. Exs. 40, 41 and 45.) Defendant's environmental specialist, Gary Paul Franklin, also observed that Gov. Ex. 101 was slightly out of square. (Testimony of Franklin, p. 389, lines 1–3; lines 19–21; Def. Ex. 28 and 29.) However, there is no evidence that the defendant detrimentally relied on the legal description of the line or was otherwise prejudiced by the existence of this "distortion" in making his decisions concerning construction. In fact, in the one area—block 711, lots 1 and 2—in which there is a significant deviation between the legal description and the line as it appears on Gov. Ex. 101 (Testimony of Speitel, p. 432, lines 17–25; p. 433, line 1), the evidence is clear that the defendant knew where the wetland line passed through the property and knew that a corner of the building he had built extended over the line. (Testimony of William Sweeney, p. 548, lines 3–14; testimony of Ciampitti, pp. 475–480; Def. Exs. 4 and 5.) Because de-

fendant's obligations arose from this court's November 28, 1984 order which incorporates Gov. Ex. 101 by reference, and because we are satisfied from the evidence that defendant's surveyor had no difficulty locating that line in the field, we find the purported deviation between the line on Gov. Ex. 101 and its legal description to be irrelevant for purposes of this proceeding. We now turn to the more substantive defenses raised by the defendant.

### Diversity of Ownership.

■ Defendant claims that he was frustrated in his attempt to remove fill and to restore the designated wetlands areas by the fact that many of the areas to which such obligations extended were owned by other people. We agree that a substantial portion of the land represented by the areas shaded in yellow on Gov. Ex. 101 is owned by others. (Testimony of Ciampitti, p. 454, lines 2–23; Def. Exs. 24 and 28.) However, this fact, by itself, should not preclude defendant's compliance with this court's order. At the first hearing in this matter, which ultimately led to the issuance of a preliminary injunction, we made the following findings:

Bruce Nicholas Ciampitti, Robert's brother and the largest single owner of parcels of land at the site, gave Robert a power of agency for all land at the site in the name of Bruce Nicholas.... [Bruce Ciampitti holds title to the land under the name Bruce Nicholas....]

In addition, Robert Ciampitti was designated agent and representative for Pacific Four and all individual lot owners at the site to secure all necessary approvals to install improvements at the site.... Those individuals are paying Robert Ciampitti for his efforts on their behalf, ... and, in some instances, Ciampitti has directed and paid for filling activities at the site himself, hoping later 'to strike a deal' with the actual property owners....

In light of Robert Ciampitti's activities at the site, the parties stipulated on the record that he is the principal defendant—the one responsible for having conducted the activities at the site.

*U.S. v. Ciampitti,* 583 F.Supp. at 485–486. At the most recent hearing, the defendant again confirmed that he was responsible for the placement of fill in the areas designated in yellow on Gov. Ex. 101, including those properties in which he held no ownership interest:

Q. (By the Court): ... Now looking at those that you have indicated are owned by others and so designated within the yellow fill areas, you put the fill in those areas, did you not?

A: (Ciampitti): The fill on the individual lots themselves, Your Honor, was paid for by the lot owners, and they—

Q: I'm not remotely interested, sir, in who paid for what.

A: They contracted—

Q: I'm asking who put the fill in, did you have any—

A: Yes.

Q: Anything to do—

A: Yes, I did, Your Honor.

Q: With putting the fill in the areas that are owned by others?

A: Yes, I did, Your Honor.

(Testimony of Ciampitti, p. 528, line 17; p. 529, line 9.) More importantly, the defendant also admitted that despite this court's order directing removal of the fill, he never even requested permission from the other property owners to remove the fill from their land:

Q: (By the Court): All right. Now all of a sudden you find yourself in this litigation and a federal court says you, Mr. Ciampitti, should not have put that fill on these people's properties even though you did it at their request. Did you go back to those property owners and say, oh, gee, by the way, remember you told me to put the fill in there and a federal court has now said that this is federal wetlands and that fill can't be in there and the court has ordered me to remove it from your property as well as all other areas designated, may I have your permission to do that? Did you say that to them?

A: (By Ciampitti): No, Your Honor, not to that extent....

Q: ... You mean to say that you are using that as an excuse for not complying with the orders of this court in reference to the removal of these materials from property not owned by you because you don't have their approval, and you never asked them for the approval.... I find it totally beyond comprehension how your attorney can seem to use as an excuse ... for not complying with this court's order of removal that to do so you'd have to have the permission of people who owned the land on which a portion of this material is and you know that you did it, you put it there, at their request, and you never even approached them, told them the situation, told them the potential position in which they and their properties find themselves should they not grant approval for the removal and you never even asked them. And knowing that, you still presented it through your attorney to the Army Corps of Engineers as an excuse. I don't have their approval. Is that what happened?

A: I think so, Your Honor.

(Testimony of Ciampitti, p. 531, line 15; p. 533, line 14.) Under these circumstances, where the defendant never even attempted to gain permission to remove fill from other property owners, and there is no evidence that such permission would be refused, we must reject defendant's claim that the diversity of ownership at the site prevents him from complying with this court's order.

■ Defendant also contends that he was frustrated in his attempt to comply with the court's removal and restoration orders by the existence of public utilities at the site. It is true that there are public utilities—namely, sewer, water, phone and electric lines—underlying portions of Memphis, Rochester and South Station Avenues, and Park Boulevard in the wetlands area. (Testimony of Franklin, p. 270, lines 10–25; p. 271, lines 1–22; Def.Ex. 29.) However, it is not clear how the presence of these utilities prevents the defendant from carry-ing out the court's directives. In a letter dated September 4, 1986, to the Corps of Engineers, defendant's counsel stated that "Mr. Ciampitti under no circumstances can remove the dedicated road and utility facilities." (Gov.Ex. 9.) However, defendant testified that he *never* contacted the public utilities authorities to determine whether the presence of the utilities posed an insurmountable hurdle to compliance with this court's order. (Testimony of Ciampitti, p. 497, lines 14–25; p. 498, line 1.) Under these circumstances, we find no evidence that the existence of the utilities at the site actually impeded the defendant in any way, and therefore we find his defense of impossibility in this regard to be meritless.

*Corp's awareness of additional filling by defendant.*

Defendant also proffers, as a defense, the fact that the Corps knew of certain of his additional illegal filling activities and failed to take any responsive action. Specifically, defendant contends that the Corps was aware that he constructed the boat ramp and portions of the structure at block 711, lots 1 and 2 in the restricted wetlands area.

■ There are several difficulties with this argument. First, by virtue of this court's November 28, 1984 order, the defendant had an independent obligation to cease his fill activities in the wetlands, regardless of whether the Corps was diligent in its policing efforts. In other words, the defendant is ultimately responsible to the court, not the Corps, and he must comply with every aspect of the court's order even though the Corps may be lax in enforcing it.

■ Next, even assuming that the defendant could argue that he was entitled to rely on the Corps' inaction as a sign that he was in compliance with the court's order, we find that this contention must also fail because there is no evidence that the Corps knew of the illegal fill activities until after they occurred. The Corps first became aware of the existence of the boat ramp in the spring of 1985 after receiving a com-

plaint about purported additional filling in the wetlands, and discussing the matter with Ciampitti. (Testimony of Pacione, p. 131, lines 23–25; p. 132, line 1; testimony of Ciampitti, p. 464, lines 15–24; Gov.Ex. 14.) Pacione then conducted two inspections at the site and determined that the structures intruded into the federal wetlands. (Gov.Ex. 14 and 15.) By letter dated October 16, 1985, the Assistant United States Attorney, Samuel P. Moulthrop, informed the defendant's attorney of his belief that the boat ramp was constructed in the federal wetlands. (Gov.Ex. 24.)

Clearly, under these circumstances, where the Corps was not informed of the existence of the boat ramp until after it was constructed in the wetlands, the defendant cannot plausibly contend that he believed he had authorization from the Corps to implement construction in that area. Defendant also appears to argue, however, that because the Corps took no further action with respect to the boat ramp until it initiated the present proceedings, his non-compliance with the court's order is somehow excused, or its magnitude diminished. We find this argument to be without merit. The defendant need not, and should not, await the institution of contempt proceedings before he begins to comply with an order of this court. As explained above, while this court necessarily must rely upon the Corps to police the defendant's compliance with our orders, the defendant always has an independent duty to follow faithfully the court's directives. Therefore, inaction or delayed action by the Corps has absolutely no bearing on the wrongfulness of defendant's conduct.

Defendant also contends that the Corps was aware of his construction on block 711, lots 1 and 2, and therefore that his incursion into the wetlands in that area is somehow excused. Specifically, the defendant concedes that he knew immediately after construction that the structure on this property, which had the "false corner" described above, intruded on the federal wetlands. (Testimony of Ciampitti, p. 483, lines 12–24.) However, he took no action to rectify the situation, deciding instead to await instructions from the State Department of Environmental Protection (DEP), from whom he had applied for a development permit pursuant to the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19–1 *et seq.* (Testimony of Ciampitti, p. 482, lines 19–25; p. 483, lines 1–5, line 25; p. 484, lines 1–5.) Defendant also did not directly notify the Corps of the wetlands problem because he knew that the Corps received copies of the correspondence relating to the CAFRA permit. (Testimony of Ciampitti, p. 484, lines 7–18; p. 485, lines 8–11; Def.Ex. 33A, 34 and 35.) On August 26, 1986, the CAFRA permit was approved by the DEP. (Gov.Ex. 27.) With respect to the structure located on block 711, lots 1 and 2, the CAFRA permit did not order its removal, but instead adopted the defendant's proposal that restoration start one foot from the structure. (Gov.Ex. 27, p. 8; Def.Ex. 6.) Having received this approval from the DEP and having heard no objection from the Corps, the defendant argues that he was entitled to maintain the illegal fill in the area, in the good faith belief that the Corps had implicitly authorized his activities.

We find this argument to be utterly specious. First, as we emphasized earlier, the defendant was and is under a binding court order restraining him from placing fill in the wetlands. Absent modification or relaxation of that order by this court, it is of no relevance whether the Corps, the DEP, or any other state or federal agency approved of the defendant's activities. It is to this court alone that the defendant must apply when he contemplates engaging in fill activities in violation of our order.

The defendant's behavior is even more disturbing, however, because it is abundantly clear from the evidence of record that the defendant never informed the DEP or the Corps that the structure—which had been completed by the time the CAFRA permit application was submitted—intruded into the federal wetlands. The building was originally constructed pursuant to a building permit that called for an angled-off corner to accommodate the wetlands line. (Testimony of Ciampitti, p. 477, lines

24–25; p. 478, lines 1–18; Def.Ex. 5.) The structure was eventually built, as noted above, with a squared off "false corner" that intruded into the wetlands. The CAFRA permit application submitted in connection with this property, a copy of which was provided to the Corps, contained nothing that would put the recipient on notice that a portion of the structure for which the permit was being sought was located in the wetlands. (Testimony of Franklin, p. 393, lines 13–19; Def.Ex. 33(a).) Defendant's agent, Speitel Associates, later supplemented the CAFRA permit application with a site sketch of the structure at block 711, lots 1 and 2 and a proposed restoration plan of that property. (Def.Ex. 6.) The site sketch depicts the blueprint of the building as it exists, with the squared-off corner and an unidentified line touching that corner. The sketch also indicates that the area outside of the line would be restored through sloping and grading. Nothing in the sketch or the accompanying letter indicates the location of the federal wetlands boundary. Moreover, neither the sketch nor the letter reveal that a portion of the structure and the area of proposed restoration are in the federal wetlands. (Testimony of Franklin, p. 339, lines 17–25; p. 340, lines 1–3; Def.Ex. 6.) Instead, the sketch gives the impression—whether intentionally or unintentionally—that the unidentified line delineates the wetlands boundary and therefore that the structure does not encroach into the wetlands.

Mr. Franklin, of Speitel Associates, testified that he did not indicate the location of the wetlands line on the site sketch because he believed that the state authorities already knew where it was. (Testimony of Franklin, p. 348, lines 7–15; p. 349, lines 5–14.) However, there is no evidence in the record that the defendant ever informed the state authorities of the precise location of the wetlands boundary and its relation to his construction and fill activities on block 711, lots 1 and 2. In other words, although the state authorities were aware that the wetland boundary cut across the property, there is no evidence that they were informed that the structure itself intruded into the wetlands. Steven Whitney, the Chief of the Bureau of Planning and Project Review for the DEP's Division of Coastal Resources, testified that the state authorities did not know that a portion of the building was located in the wetlands. (Testimony of Whitney, p. 582, lines 8–20.) The language of the permit itself corroborates this, as it provides:

> The structure is not located in the federal wetland area, but one corner touches the wetland boundary line. The applicant has proposed that '[r]estoration will start one foot from the house. At that point, a rock rip-rap slope at 2:1 ratio will grade into the surrounding lowland elevations. This slope and surrounding area will be hand graded and cleaned.' Given the acceptability of the structure as determined by the DAG, this proposal is acceptable because the site will be graded down to the elevation required for wetlands restoration in the area under jurisdiction of the Corps to the maximum practical extent under the circumstances.

(Gov.Ex. 27, p. 8.)

Moreover, the defendant never informed the Corps, either directly or indirectly, that he was placing fill in the wetlands on block 11, lots 1 and 2. The Corps was not copied on the supplemental permit application and site sketch. (*See* Def.Ex. 6.) The communications which the Corps did receive, from Speitel Associates or from the State, relative to the CAFRA permit application, did not contain any information that would lead the recipient to believe that the CAFRA permit would authorize filling in the wetlands area. (Testimony of Franklin, p. 393, lines 4–19; p. 394, lines 9–21; p. 399, lines 18–24; Def.Exs. 33(a) and 35 and Gov.Ex. 28.) In addition, as noted above, the CAFRA permit itself, of which the Corps received a copy, did *not* authorize filling in the wetlands. In fact, one of the administrative conditions for issuance of the permit required that the applicant "carry out wetlands restoration in accordance with the provisions of Judge Gerry's order in Civil Action No. 83–4004 to the satisfaction of the Corps of Engineers, the plan's approval authority."

Under all of these circumstances, we must reject defendant's argument that he maintained the illegal fill on block 711, lots 1 and 2, in the good faith belief that the Corps was aware of it and implicitly approved it. Rather, we find that the evidence of record shows a deliberate and continuous effort by the defendant and his agents to conceal from the state and federal aauthorities the fact that he had placed further fill in the wetlands in violation of this court's order. We will not now allow the defendant to use the CAFRA permit he obtained through this deception as a defense in this contempt proceeding. For all of the foregoing reasons, we find no merit to the defendant's argument that he relied in good faith on the Corps' inaction as an excuse for his non-compliance with the court's order.

*Corps' refusal to meet with the defendant.*

■ Finally, the defendant argues that it was impossible for him to comply with the court's order to remove the fill and restore the site because the Corps refused to meet with him regarding the proposed restoration plan. Defendant contends that in order to develop a realistic restoration plan, he had to meet with the Corps to discuss the problems posed by the presence of utilities and trash in the filled areas, and by the fact that some of the fill was located on properties owned by others. (Testimony of Ciampitti, p. 496, lines 6–24.) As discussed above, we find no evidence in the record that these problems cited by the defendant in any way prevented him from complying with this court's order, although we do believe that a meeting between the Corps and the defendant might well have been useful in expediting development of a satisfactory restoration plan. Even assuming that a meeting with the Corps was necessary before defendant could comply with the court's order, though, we find that the defendant himself is responsible for the failure of such a meeting to occur.

Defendant (through Speitel Associates) submitted his proposed restoration plan to the Corps on January 28, 1985. (Gov.Ex. 3.) By letter dated May 8, 1985, the Corps rejected the proposed restoration plan and notified the defendant that certain specific revisions would be required. (Gov.Ex. 4.) Between that date and June 5, 1986, when the Section 404 permit application was denied by the Corps, the defendant never requested a meeting with Corps officials to discuss the restoration plan. (Testimony of Gale, p. 571, lines 7–24.) By letter dated August 11, 1986 to defendant's counsel, Timothy Sullivan, the District Counsel of the Corps, reminded the defendant of his obligation to submit a revised restoration plan. (Gov.Ex. 6.) Defendant's counsel responded in a letter dated August 14, 1986 that stated, in pertinent part:

... As I understand it, the reason that no restoration plan has been submitted is that everyone was well in accord that restoration of what was basically a former garbage dump and of no environmental value would be senseless.... Secondly, and perhaps most importantly, the denial by the Corps of Engineers for the application for permit as to the areas in question has 'ripened' our claim in the above matter for inverse condemnation under the recent United States Supreme Court cases.... Thus, it would appear to be contradictory for us to restore an area which has already been taken by the United States. We will certainly be cooperative as to your thinking in this regard.

It is my suggestion that before the matter gets off on the wrong track that we all closely coordinate this. I respectfully request a meeting ... so that this cannot only be discussed but some path pursued. My thinking is basically that we should be pursuing an amicable and agreeable evaluation procedure with regard to the property. Hopefully a market value figure can be reached with respect to the inverse condemnation claim. On the other hand, I am thoroughly open-minded with respect to any other suggestions which you may have.

(Gov.Ex. 7.) Sullivan responded in a letter dated August 22, 1986. He refused the defendant's request for a meeting, explaining:

I can think of no useful purpose to be served by further discussion at this

point. Judge Geary's [sic] order of November 28, 1984 is clear and unambiguous. The fill material at the violation site is to be removed pursuant to a Corps approved restoration plan. Mr. Ciampitti has already been notified twice of his obligations under the court order. As of this date we are still not in receipt of an acceptable restoration plan. I, therefore, again request the immediate submittal of the proposed revised restoration plan.

(Gov.Ex. 8.) By letter dated September 4, 1986 to Sullivan, defendant's counsel again requested a meeting:

... [I]n an attempt to amicably resolve this matter in a sensible and pragmatic manner, I suggested a meeting because of the following:

1. Mr. Ciampitti under no circumstances can remove the dedicated road and utility facilities. He under no circumstances can remove anything from the properties that do not belong to him. This was pointed out during the litigation and as a result of your recent correspondence it now surfaces as a real problem. I'd like to meet to discuss this in depth.

2. A new plan is in the process of being prepared and will be submitted which hopefully will avoid or minimize the amount of restoration necessary. It will provide a water related use together with appropriate [m]itigation.

3. It appears from recent cases observed that financial sums have been accepted by the Corps in certain cases where restoration was not feasible. We'd like to discuss that also.

(Gov.Ex. 9.) Finally, defendant's counsel also addressed the issue of meeting with the Corps in a letter to Sullivan dated December 18, 1986. That letter states, in pertinent part:

... Please be advised as follows:

1. A matter is presently pending in the U.S. District Court of Claims. Until that is resolved, Mr. Ciampitti is in no position to proceed with any restoration plan.

2. The order relates to some properties that are not owned by Mr. Ciampitti. He does not have the approval or consent of the owners to enter onto the property.

Your aid in obtaining a supplemental order to that effect will be necessary.

3. A revised plan, involving a water related use, has been or is in the process of being completed with the permit section. Please check with them as to the status. I will check with our consultants accordingly.

(Gov.Ex. 29.)

Based on this correspondence, the defendant contends that he attempted, in good faith, to arrange a meeting with Corps personnel to discuss difficulties he encountered in developing a revised restoration plan, and that the reason such a meeting never occurred was due to the Corps' intransigence. We disagree. It is manifestly clear from a review of the letters sent by defendant's counsel that the defendant did not seek a meeting with the Corps to discuss specifics of the restoration plan, but rather to discuss *alternatives* to restoration. In one of the letters, defendant's counsel flatly refused to proceed with the restoration plan while the defendant's suit was pending in the Court of Claims. (Gov.Ex. 29.) The letters also assert that the defendant cannot remove utilities or proceed with restoration on land owned by others, although the evidence at the hearing made clear that the defendant had no basis for these contentions. In short, we find that these letters evince an attempt, by the defendant, to avoid his obligations under this court's order. We believe that the Corps acted properly in refusing to meet with the defendant under those circumstances.

Finally, we note that even if the defendant truly felt that the Corps' refusal to meet with him impeded his effort to comply with the court's order, the proper recourse would be to bring the problem to the attention of the court. Our November 28, 1984 order specifically provided that:

In the event there arises a dispute concerning the plan or any other provision of this order, any party may apply to the court to resolve such dispute.

Neither the defendant nor any of his agents sought such relief from this court.

For all of these reasons, we find no merit to defendant's argument that his attempt to comply with the court's order was made impossible by the Corps' refusal to meet with him.

### e. *Coercive sanctions.*

Based on the foregoing findings, we conclude that the plaintiff has established by clear and convincing evidence that the defendant violated this court's November 28, 1984 order by failing to complete removal and restoration work at the site within the prescribed time periods, and by placing additional fill—paving, a boat ramp, and additional structures and associated fill—in the federally regulated wetlands. Moreover, we find that the plaintiff has demonstrated by clear and convincing evidence that the defendant violated the November 26, 1984 consent order entered into by the parties by failing to remove sidewalks he constructed on Memphis and Rochester Avenues within the federal wetlands area. We also find that the defendant has failed to carry his burden of demonstrating, by competent evidence, that he substantially complied with the orders or that his non-compliance was due to an impossibility of performance. Accordingly, we adjudge the defendant to be in civil contempt of these two orders of the court.

■ Having found that the defendant is in civil contempt of the orders of this court, we now turn to a consideration of the appropriate sanctions to be imposed. In *United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Supreme Court explained the purpose of sanctions in civil contempt proceedings:

> Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. [Citation omitted.] Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and

his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.

> But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.

> It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed ... as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.

*Id.* at 303–304, 67 S.Ct. at 701.

In the present case, given the history of the defendant's repeated, flagrant violations of this court's orders, we are convinced that coercive sanctions are necessary to induce defendant's future compliance. As the record indicates, the defendant was already adjudged to be in contempt of the preliminary injunction on one occasion. A second contempt proceeding was resolved through a consent order. The defendant has undertaken none of the removal or restoration work required by this court's November 28, 1984 order despite the passage of approximately seven months since he became obligated to do so. Thus, despite defendant's repeated assertion that he is now willing to remove the offending fill and complete the restoration, *see, e.g.,* testimony of Ciampitti, p. 503, lines 17–20, his past conduct belies this contention. Moreover, the defendant has further violated the court's order by placing additional fill in the wetlands, thereby raising the possibility that the defendant will continue to intrude upon and destroy valuable wetlands unless coercive sanctions are employed. Finally, and most significantly, the defendant has involved innocent third parties in his illegal filling activities. He obtained a state CAFRA development permit after concealing from state officials

that the structure for which he sought the permit intruded upon the federal wetlands. In addition, he consummated sales of property and homes—namely, 104/106 Rochester Avenue, and 100/102 and 105/107 Memphis Avenue—to innocent bona fide purchasers without first informing them that the land and structures themselves encroached upon the wetlands area. In light of all of these facts, the court finds that coercive sanctions are warranted.

In order to provide the defendant with adequate time to fulfill his obligations under our November 28, 1984 permanent injunctive order, the court will set the following timetable for compliance and will modify our previous order accordingly. The defendant is directed immediately to begin removal of the fill described in paragraph 2 of our November 28, 1984 order. In addition, the defendant is ordered to remove all fill, with the exception of the structures on block 711, lots 1 and 2 and block 706, lots 5, 6, 33 and 34 and the fill associated with those structures, that he has placed in the restricted wetlands area since the issuance of our November 28, 1984 order. All fill removal shall be completed no later than 30 days after entry of our order. We note that we are excluding block 711, lots 1 and 2, and block 706, lots 5, 6, 33 and 34 from the scope of our fill removal order because we find that those improved properties have been transferred, subsequent to the filling activities to innocent bona fide purchasers. Moreover, the unusual circumstances surrounding these particular properties—specifically, the fact that the homes themselves constitute a portion of the illegal fill—render it inequitable to include these properties within the scope of the removal order.

Defendant is also directed to submit a revised restoration plan which is responsive to and compliant with the comments and requirements set forth by the Corps in its letter dated May 8, 1985 (Gov.Ex. 4), no later than 30 days after entry of our order. The Corps is directed to make its representatives available for a meeting with the defendant and his representatives within this 30 day period. However, defendant's obligation to submit the revised restoration plan is not conditioned or contingent upon the occurrence of such a meeting. Once the Corps is in receipt of the revised restoration plan, it is directed to take action, either by approving, modifying and approving as modified, or disapproving of the plan, within seven days. If the plan is disapproved, the defendant is directed to submit a revised plan that complies with the requirements set forth by the Corps within 15 days of his receipt of the notice of disapproval. If this revised plan is again disapproved by the Corps, the parties are directed immediately to submit the dispute to this court for resolution. Once a restoration plan has been approved by the Corps, as submitted or as modified, the defendant shall complete all work necessary to implement the plan or modified plan no later than 45 days after approval by the Corps.

The defendant is also directed to submit periodic written reports to the court, as each deadline set forth above is reached, certifying and detailing the extent of his compliance with the court's order. He is also directed to contemporaneously submit copies of these reports to the Corps for their verification to the court.

Finally, in order to coerce defendant's compliance with the terms of this order, the court will require the defendant to pay a fine of $2000 for each day that he violates any of the terms of this court's November 28, 1984 order, as modified here. Given the defendant's past history of repeated violations of this court's orders, we believe that this sum, though substantial, represents the minimal amount necessary to induce defendant's future compliance. In this regard, we are influenced by the November 26, 1984 consent order in which the parties agreed that a $1500 fine was adequate and appropriate to ensure the defendant's compliance with the orders of the court. It is now apparent, given the defendant's disregard of his obligations under that order, that the threat of a $1500/day sanction was insufficient to coerce the defendant, and therefore we have raised the potential fine to $2000/day. The court will closely review the periodic reports submitted by the

defendant, and the comments, if any, to those reports by the Corps. If it appears that the imposition of the $2,000/day coercive sanction is not achieving defendant's compliance with the court's order, we will, on motion or *sua sponte*, raise the fine by such minimal amount as we find to be necessary to induce such compliance by the defendant. Moreover, if defendant's contumacious conduct persists despite the imposition of these monetary sanctions, the court will consider incarcerating the defendant until he takes steps to carry out the orders of this court.

In addition to monetary sanctions, the plaintiff also seeks compensation for the costs it incurred in bringing the present contempt proceedings. We agree that the plaintiff is entitled to recover an award for the attorney's fees it incurred in connection with this motion. Counsel for the plaintiff is directed to submit an affidavit of services to this court and to the defendant.

### 2. Civil Penalties

█ Plaintiff also seeks an order imposing civil penalties under the Clean Water Act. The Clean Water Act prohibits the unauthorized discharge of fill material in the wetlands. 33 U.S.C. §§ 1311, 1344 and 1362(7). Under 33 U.S.C. § 1319(d), a court is authorized to impose a civil penalty of up to $10,000 for each day on which a violation of the Act occurs. In our November 28, 1984 opinion and order, we declined to rule on the issue of civil penalties, in the hope that the defendant would act in good faith to comply with the requirements of the Act. As we explained:

> ... This defendant clearly violated sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1344, on at least 15 separate days (including those violations occurring after the court's order of April, 1984).... The Government urges that the flagrancy of Ciampitti's conduct warrants a substantial penalty.

The court does not entirely disagree. However, the question of penalties will be held in abeyance pending the preparation and implementation ... of the restoration plan. We believe this course is appropriate because it is more important that the site be restored than that the defendant Robert Ciampitti be punished. To the extent that Robert Ciampitti is not a person of unlimited resources, the court prefers that his resources be initially spent on clean-up of the site.... Furthermore, defendant Robert Ciampitti's good faith in preparing and implementing a restoration plan is a relevant factor in assessing the size or necessity of civil penalties.

*U.S. v. Ciampitti*, 615 F.Supp. at 124–125.

The plaintiff now renews its motion for civil penalties, urging that the defendant's conduct since our November, 1984 ruling evinces an utter disregard of the requirements of the Clean Water Act and therefore warrants the imposition of civil penalties. Based on our findings of fact[1] set forth in connection with the contempt proceedings, we are forced to agree with the plaintiff that the anticipated cooperation and good faith compliance, on the part of the defendant, with the requirements of the Clean Water Act has not materialized. Instead, the record is replete with instances of the defendant's violations of this federal statute. As set forth in detail above, the defendant has continued to illegally fill the wetlands, despite a "cease and desist" letter issued by the Corps on September 15, 1983, a temporary restraining order issued by this court on October 24, 1983, a preliminary injunction issued on April 2, 1984, and a permanent injunction issued on November 28, 1984. We also find, despite defendant's assertions to the contrary, that he has not exhibited even a modicum of good faith in his attempts to comply with the Clean Water Act. He recently placed houses and fill in the federal wetlands and then sold those properties to innocent third parties,

---

1. We note that in *Tull v. United States,* —— U.S. ——, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the Supreme Court ruled that a defendant is entitled to a jury trial on the issue of his liability for civil penalties under the Clean Water Act. In the present case, however, the defendant never requested a jury trial, and accordingly we rely on the factual findings made in connection with this proceeding and the two previous hearings.

without first informing them of the presence of the wetlands. He has not removed an ounce of the illegal fill that he has placed in the wetlands over the past four years. Moreover, we find, for the reasons described above, that the defendant's asserted reasons for his non-compliance with the statute—existence of garbage, alleged distortions in the control map, diversity of ownership of the lands involved, the existence of public utilities, the Corps' awareness of his filling activities, and the Corps' refusal to meet with him—are without evidential support in the record. In short, we conclude that the defendant's conduct since 1980, when he was first made aware of the existence of wetlands at the Diamond Beach site, evidences a total lack of respect for, and disregard of, the requirements of the Clean Water Act.

In *Tull v. United States, supra,* 107 S.Ct. at 1838, the Supreme Court described the legislative purpose of the civil penalty provision in the Clean Water Act:

> The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. 123 Cong.Rec. 39191 (1977) (Sen. Muskie citing EPA memoradum outlining enforcement policy). A court can require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good faith efforts to comply with the relevant requirements. *Ibid.*

Given the extraordinary history of defendant's repeated violations of the Clean Water Act, his utter lack of good faith in attempting to bring his activities within the confines of the law, and the threat that defendant's conduct poses to a valuable, environmentally sensitive area, we believe that a substantial civil penalty is warranted. Accordingly, we will impose a fine of $1,000 for each day that the defendant has violated the Clean Water Act. A day of violation constitutes every day that a violator allows illegal fill material to remain in federally regulated wetlands. *United States v. Cumberland Farms of Connecticut,* 647 F.Supp. 1166 (D.Mass.1986). By this court's order of November 28, 1984, the defendant's fill removal obligations were stayed until 75 days after the denial, by the Corps, of his application for a § 404 permit. The application was denied on June 5, 1986, and therefore the defendant was obliged to remove all fill by August 19, 1986. Accordingly, the civil penalties will be imposed for the days of August 20, 1986 through March 27, 1987, the day of the last Corps inspection of the property (testimony of Pacione, p. 121, line 3) for a total of 220 days. In addition, we will impose a civil penalty of $1,000 per day for each of the 15 days that we previously found the defendant to be in violation of the Clean Water Act. This penalty, which in total amounts to a fine of $235,000 is imposed with the aim both of punishing the defendant and of deterring him and others from taking further action that is destructive of the federally protected wetlands.

### 3. *Corps' Duties*

It was brought to this court's attention, during the course of our hearings, that the individual property owners at the Diamond Beach site had not been adequately informed of the presence of illegal fill on their properties and of the fact that the defendant was under a court order to remove it. The Corps is directed, if it has not already done so, to advise these property owners of this court's orders regarding fill removal and restoration and of the extent to which their property contains wetlands. The Corps shall also ascertain from owners of property from which fill is to be removed, whether or not they will grant permission to the defendant, his agents or other designees of the court, for the fill removal, and shall advise them that if they refuse permission they may be subject to joinder as defendants in this action. In addition, we will require the Corps to notify this court of any such property owners who refuse to allow the removal of the fill.

Finally, in the hope of avoiding future confusion over the location of the federal wetland boundary, the Corps is directed to stake that boundary in the field. Should any disputes arise concerning the correct-

ness of the line so staked, the parties shall submit the issue to the court for resolution.

Counsel for the plaintiff shall submit an order consistent with this opinion.