Robert CIAMPETTI,[1] et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 440–87L.

United States Claims Court.

Oct. 31, 1989.

---

**1.** Lead plaintiff's name is misspelled in the caption of the complaint. The correct spelling, "Ciampitti," will be used in the opinion.

Alfred A. Porro, Jr., Lyndhurst, N.J., for plaintiffs.

Dorothy R. Burakreis, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Pending is defendant's motion for summary judgment. Defendant has moved that the complaint be dismissed on one or all of several grounds. For the reasons that follow, defendant's motion is denied. On grounds independent of those urged in defendant's motion, plaintiffs' claim is dismissed in part.

## I. BACKGROUND

The property which is the subject of this inverse condemnation action is located within the Diamond Beach section of the Township of Lower, County of Cape May, in New Jersey. Diamond Beach is a rectangular parcel of land running roughly north to south, with its southernmost edge fronting the Atlantic Ocean. The United States Army Corps of Engineers (the "Corps") has determined that most of the property in the northern part of Diamond Beach comes within the definition of "wetlands" found in regulations promulgated under the Federal Water Pollution Control Act ("the Clean Water Act"), 33 U.S.C. §§ 1251–1376 (1982). *See* 33 C.F.R. § 323.2(7)(c) (1986). This determination has been judicially upheld. *United States v. Ciampitti ("Ciampitti I")*, 583 F.Supp 483 (D.N.J.1984).[2]

New Jersey also designates as state wetlands much of the property in northern

---

**2.** The Corps has jurisdiction under the Clean Water Act to regulate "waters of the United States." *See* 33 U.S.C. § 1344; 33 C.F.R. § 323.1 (1986). According to regulations implementing § 1344, "waters of the United States are defined to include 'wetlands.'" 33 C.F.R. § 323.2(a)(2).

Diamond Beach. The state wetlands area is nearly as extensive as the federal, and is contained entirely within the federal wetlands. Both the federal and state wetlands have irregular boundaries which do not conform to the grid of streets, city blocks, and smaller lots into which Diamond Beach is divided. Many of the lots and the blocks are only partially within the federal or state wetland area.

The property which plaintiffs allege has been taken consists of a collection of 573 rectangular lots, mostly of uniform size. These lots, not all of which are contiguous, are scattered throughout the entire Diamond Beach tract. Of the 573 lots, approximately 206 are wholly or partially within the area designated as federal wetlands. Approximately 167 of the 206 federal wetlands lots are also wholly or partially within state wetlands.[3]

Plaintiffs acquired the property identified in the complaint through a series of purchases beginning in September 1980 and continuing into 1987.[4] When these purchases began, the property was at least partially undeveloped.[5] In March 1983, plaintiff Robert Ciampitti learned of a 1907 riparian grant held by predecessors in interest of the Diamond Beach site. Defendant contends, and plaintiffs dispute, that plaintiff Robert Ciampitti, after learning of

this grant, began filling and dredging without first applying for a state or federal wetlands permit. Despite plaintiff's denial, however, it is undisputed that on September 15, 1983, the Corps, citing violations of the Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1151 (1899), (codified at 33 U.S.C. §§ 401–418 (1982)) ("the Rivers and Harbors Act"), and the Clean Water Act, issued a cease and desist order to Robert Ciampitti regarding illegal dredging and filling activity on the federal wetlands located in Diamond Beach. In addition, some of the property at issue, including portions of the land involved in plaintiffs' present takings claim, was subject in August 1984 to a state cease and desist order regarding illegal filling and dredging in state wetlands.[6]

The Corps' cease and desist order was plaintiffs' first contact with the federal government in connection with the property now claimed taken, and lead ultimately to this inverse condemnation action. This action, however, was initiated only after an unsuccessful suit in state court against New Jersey, a law suit which included, *inter alia,* an inverse condemnation claim.

### A. *Plaintiffs' Lawsuit Against New Jersey*

The same plaintiffs involved in the present action filed suit against New Jer-

---

The Corps therefore has jurisdiction to regulate all of the property in Diamond Beach which it has designated "wetlands."

**3.** As noted above, the state and federal wetland boundaries are irregular. Many of the lots are therefore only partially within wetlands areas. With some of the lots, it is difficult or impossible to tell from the maps in the record whether they are actually within a wetlands area. The numbers given here, therefore, are only approximations.

**4.** Although the deeds to the various lots are in many different names, defendant asserts and plaintiffs concede that all of the property listed in the complaint is under the control of Robert Ciampitti. Many of the plaintiffs on the original complaint have since been voluntarily dismissed without any amendment to the complaint.

**5.** The Diamond Beach site was not untouched land when the plaintiffs began to acquire property there. To be made suitable for residential

development, however, further development, including filling and dredging, is required.

**6.** This was not the first state cease and desist order involving illegal filling activity in the sections of Diamond Beach designated as state wetlands. It was, however, the first addressed to plaintiff Robert Ciampitti. An earlier order, issued in September 1983, had been addressed to the Diamond Beach Venture Association ("the Association"), c/o William Ciampitti, Robert Ciampitti's father. Robert Ciampitti denies any involvement with the Association, and denies that the land then at issue is the same land involved in this law suit. This contradicts the record. The first cease and desist order cited lots 1, 14, 15, 25, and 33, of Block 731. These are listed in the complaint. A deed dated October 22, 1981, almost two years before that order, transfers the property to plaintiff Bruce Nichols. It is undisputed that this is one of the many transfers of Diamond Beach property into plaintiff Ciampitti's control during plaintiffs' acquisition of the property in question.

sey in the Superior Court of New Jersey on May 14, 1984. (This was three months prior to New Jersey's cease and desist order discussed above.) That law suit involved the same land described in the complaint filed here. Plaintiffs' suit sought to quiet title by confirming the effects of the 1907 riparian grant. Plaintiffs challenged the applicability, in light of the grant, of the permit requirements of New Jersey's Wetlands Act of 1970 (the "Wetlands Act"), N.J.Stat.Ann. §§ 13:9A–1—13:9A–10 (West 1979), and New Jersey's Coastal Area Facilities Review Act ("CAFRA"), N.J.Stat.Ann. §§ 13:19–1—13:19–21 (West 1979). Plaintiffs claimed that the 1907 grant gave them the absolute right to dredge and fill in Diamond Beach, and that therefore no permits were required.

Plaintiffs also included an inverse condemnation count in the state action. They asserted that New Jersey's Department of Environmental Protection ("DEP") had informed them that no Wetlands Act or CAFRA permits would be granted for the property in question. Plaintiffs claimed that this alleged prospective denial of development permits constituted a compensable taking.[7]

Plaintiffs succeeded in their attempt to quiet title. The court held, however, that plaintiffs were not exempt from the permit requirements of CAFRA or those of the Wetlands Act. In a consent order issued on October 12, 1984, the parties agreed to a stay of further proceedings in the action pending application by the plaintiffs for CAFRA permits.

Thereafter plaintiff Ciampitti initiated the pre-application process for obtaining the state CAFRA permits. Pre-application Environmental Impact Statement submittals described two different phases of proposed development—Diamond Beach Phase I and Diamond Beach Phase II. Most of the land in the Diamond Beach Phase I

project lay in the southern portion of Diamond Beach, and therefore did not involve state or federal wetlands. Diamond Beach Phase I, however, did include some lots in the northern Diamond Beach area which were within the state and federal wetlands. Phase II covered land in the northernmost section of Diamond Beach, and included much of the land which is the subject of this law suit.

After the pre-application documents were filed, the DEP, by letter dated January 18, 1985, informed plaintiffs that CAFRA, wetlands, and waterfront development permits would be required for the proposed projects. The letter indicated that Diamond Beach Phase I was "conditionally acceptable," while Phase II, which involved land in state wetlands, would not be consistent with the policies of the Wetlands Act and was therefore unacceptable.

A January 7, 1987 state court consent judgment conditionally approved the development proposed for Diamond Beach Phase I. Plaintiffs maintained then and continue to maintain now that this conditional approval did not constitute a CAFRA permit for Phase I and creates no inference that one would be granted.

The state action inverse condemnation count, which had been held in abeyance pending the administrative process, was dismissed. The court did not reach the question of whether permits were or were not conclusively denied. Instead, in dismissing the claim, the court stated that the Corps' 1983 cease and desist order and subsequent injunction (discussed below), was an independent limitation on development, and the taking, if there was one, was not attributable to the state.

**B.  *Action Against the United States***

The Corps' 1983 cease and desist order marked the beginning of the federal government's involvement with plaintiffs'

---

**7.** Whether and to what extent plaintiff had actually pursued any New Jersey permitting requirements was an issue in the state action. Plaintiffs claimed that DEP officials, through correspondences and meetings, made it apparent that no development permits for the land in question would be granted. The DEP took the position,

and supplied affidavits in support, that plaintiff Ciampitti never applied for any of the required permits. It is undisputed from the record in the present action that Ciampitti, following defeat in the state court regarding the applicability of the state permits to the Diamond Beach property, did begin the CAFRA permitting process.

property. That order involved some but not all of the land in this suit.

Plaintiffs insist that no additional illegal filling took place after the 1983 cease and desist order. It is undisputed, however, that the Corps later sought in federal district court to enjoin the filling activity, and that a temporary restraining order was issued on October 24, 1983. This restraining order was followed by a preliminary injunction on April 28, 1984, *Ciampitti I*, and a permanent injunction on November 28, 1984. *See United States v. Ciampitti* (*"Ciampitti II"*), 615 F.Supp. 116, *aff'd*, 772 F.2d 893 (3d Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). The court in *Ciampitti II* also required Ciampitti to submit to the Corps a plan for restoration of the wetlands. Submission of the restoration plan, however, was stayed pending application to the Corps within 45 days for a development permit pursuant to the regulations promulgated under § 11 of the Rivers and Harbors Act, 33 U.S.C. § 404. *See* 33 C.F.R. §§ 320–324 (referred to hereafter as a § 404 permit).

Plaintiffs deny that they continued illegal filling activity after the permanent injunction was ordered. It is undisputed, however, that the Corps subsequently instituted an enforcement action in federal district court with respect to plaintiff Ciampitti's filling activities. *United States v. Ciampitti* (*"Ciampitti III"*), 669 F.Supp. 684 (D.N.J.1987). The court found Ciampitti to be in contempt of court for disregard of the November 28 permanent injunction, and assessed penalties in the amount of $235,000 plus interest.

Plaintiff Ciampitti timely applied for a § 404 permit.[8] He submitted two separate applications. One application requested permission to fill, the other to dredge, on 266 lots within the northern section of Diamond Beach. The stated purpose was to complete development for streets and residential housing. Of the 266 lots specified in the permit application, 152 are included in the present claim.

The Corps informed Ciampitti that he was required as part of the permit application to obtain a determination from New Jersey that the proposed activity would be consistent with New Jersey's own coastal management policies. Such a consistency determination is required by § 307(c)(3) of the Coastal Zone Management Act, 16 U.S.C. § 1456(c)(3)(A) (1988), before any permit (including a § 404 permit) can be granted. *See* 33 C.F.R. § 325.2(b)(2) (1986). The Corps also instructed plaintiffs that a § 404 permit could not be granted without first obtaining from New Jersey a State Water Quality Certificate. *See* 33 C.F.R. § 325.2(b)(1).

Plaintiff Ciampitti never applied for a State Water Quality Certificate. As to the consistency determination, the Corps, on December 6, 1985, requested that DEP determine if the proposal for development was consistent with the the Coastal Zone Management Plan for the State of New Jersey. DEP responded by letter dated February 6, 1986, that the filling and dredging activity described in the federal permit application would not be consistent with New Jersey's Coastal Zone Management Program. It also noted that a portion of the land for which a federal development permit was being sought was within the area designated by New Jersey as state regulated wetlands, and would therefore also require a separate state permit.

On June 5, 1986, the Corps denied the federal permit application, concluding that the project would contravene federal regulations found at 33 C.F.R. § 320, as well as federal guidelines regulating the discharge of fill or dredged material, 40 C.F.R. § 320. The Corps also noted that the proposal was not consistent with New Jersey's Coastal Zone Management Program. In addition the Corps observed in a separate Statement of Findings that part of the land in question was state regulated wetlands which would require state permits if developed,

---

8. The court notes that the permit application was submitted by Spietal Corp., an environmental consulting firm, on behalf of Robert Ciampitti only. However, the land identified in the permit application is owned by Robert Ciampitti and several other plaintiffs.

and that to date the required permits had not been granted. This was relevant because Department of Army regulations require denial of a permit where independent state authorization would be required for the proposed activity. 33 C.F.R. § 320.4(j) (1986). The Corps also observed that plaintiffs never obtained the State Water Quality Certificate. The letter denying the permit informed plaintiffs that no procedure existed for appealing the decision.

Plaintiffs instituted this action on July 23, 1987. They allege that the Corps' denial of the permit destroys the use and enjoyment of their property, specifically including the 1907 riparian grant, and that it eliminates any reasonable opportunity for development. Plaintiffs assert that the Corps' action amounts to a taking for which they are entitled to recover just compensation.

Defendant filed an amended answer and counterclaim on March 13, 1989. In its counterclaim, defendant seeks to collect the penalties and interest imposed by the district court in *Ciampitti III.*

## II. DISCUSSION

### A. *Property not included in plaintiffs' permit application*

Plaintiffs' § 404 permit application involved 266 lots, all located within federal wetlands. Of these, 152 are the subject of the complaint. The complaint also includes 421 parcels of land which were not a part of the permit application.[9]

It is axiomatic that property cannot be the subject of a takings claim against the federal government unless there has been some action by the federal government. The only federal action to which plaintiffs point is the Corps' denial of a § 404 permit. Plaintiffs make no attempt to show any

---

9. Only eight of the 421 lots which are included in plaintiffs' complaint but which were not part of the permit application are within federal wetlands. These eight lots within the federal wetlands presumably could have been part of plaintiffs' permit application.

10. A takings claim is also not ripe for judicial review if a plaintiff has not exhausted all available administrative remedies. *See Myers v.*

federal impact whatsoever with respect to the 421 lots which are not included in the permit application, and the record reveals none. With respect to these lots, therefore, plaintiffs' claim must be dismissed.

### B. *Ripeness*

■ If a regulation "goes too far," it can, in substance, "take" property. If so, the affected owner is entitled to compensation. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2565–66, 91 L.Ed.2d 285 (1986), *reh. denied,* 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986). Before a determination can be made that a regulation goes too far the court must know precisely what the regulation prohibits. *Id.* As the Supreme Court notes, "[i]t follows from the very nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property." *Id.* Similarly, in *Williamson County Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985), the Supreme Court held that a regulatory taking is not ripe "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."[10]

■ In addition to *Williamson* and *MacDonald,* defendant cites the Court's decision in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). *Riverside* involved in part the issue of whether the Corps' exercise of its § 404 permitting powers could constitute a fifth amendment taking. The Court stated:

*Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938) (It is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."). In this case the Corps letter explicitly stated that there are no procedures for an appeal of the Corps' decision.

A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted,.... Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*Id.* at 127, 106 S.Ct. at 459.

Invoking the principles enunciated in these cases, defendant asserts that any takings claim by the plaintiffs against the United States is not ripe. Defendant argues that plaintiffs have not made a diligent attempt to meet the statutory and regulatory requirements of a § 404 permit. Defendant points to plaintiffs' failure to seek a State Water Quality Certificate, required under Department of Army regulations before a § 404 permit can be granted, *see* 33 C.F.R. § 325.2(b)(1)(ii) (1986), and to plaintiffs' failure to appeal the state's inconsistency determination to the Secretary of Commerce pursuant to regulations promulgated under the CZMA. *See id.* § 325.2(b)(2)(ii) (Secretary can override state if proposed activity is consistent with the CZMA or is necessary in the interest of national security). Defendant also alleges that plaintiffs never sought or received a final determination from New Jersey on whether state permits under CAFRA would be granted. Though not stated explicitly, the relevance of this to defendant's argument, presumably, is that the Corps in its denial letter stated that a § 404 permit would not be granted until all required state permits had been obtained.

The simple answer to defendant's argument is that the Corps' denial letter makes clear that lack of a consistency determination, State Water Quality Certificate, and state CAFRA permits was not determinative in its decision to deny the permit. It

recites that, "after a complete review," the Corps had determined that the proposed activity would result in "unnecessary permanent disruption to the environment" and would not reflect the national concern for both protection and utilization of important public resources. The letter also states that the proposed activity would be contrary to Federal Regulations, 33 C.F.R. § 320, and Federal Guidelines, 40 C.F.R. § 230, regulating the discharge of dredged or filled material. Only two paragraphs later does the letter discuss New Jersey's inconsistency determination: "It has also been determined that the proposed project is not consistent with New Jersey's Coastal Zone Management Program." That paragraph also states that, pursuant to Department of the Army regulations, the Department of the Army will not grant a permit if authorization for the work is required by state law (here, the CAFRA permits) and such authorization has been denied. The letter did not mention the State Water Quality Certificate. Finally, the letter states that "on balance" the project is contrary to the general public interest.

The court reads the opening paragraphs of the Corps letter as a merits-based reason for rejecting the § 404 permit application which is independent of New Jersey's failure to issue a consistency determination or grant CAFRA permits. A plain reading of the letter forces the conclusion that the Corps would have denied the permit application regardless of whether plaintiffs had obtained the state permits and consistency determination. The letter did not suggest that obtaining favorable decisions from New Jersey, or any other course of action, would be of any benefit to the plaintiffs.

The situation would be entirely different if the denial letter had been premised solely on failure to obtain permits from New Jersey or on New Jersey's refusal to give a consistency determination.[11] In that cir-

---

11. If the denial letter had been premised on the failure to receive authorization from New Jersey, defendant's argument that plaintiffs should have attempted to appeal New Jersey's determination of inconsistency to the Secretary of Commerce, and that plaintiffs should have pursued

CAFRA permitting process, would be relevant. As to the consistency determination, however, the court notes that while the Secretary of Commerce does have the authority to issue a § 404 permit despite a state's determination that the project is inconsistent with its own coastal

cumstance, it would genuinely be premature to review the Corp's action until the state process was complete.[12]

The court is unable to conclude on summary judgment that any further action by the plaintiffs would be helpful in determining the extent of the alleged taking. The court is satisfied that the Corps has conclusively denied a § 404 permit to fill and dredge. Plaintiffs' claim cannot, therefore, be dismissed on ripeness grounds.

## C. *Imputing State Action to the United States*

■ Defendant argues that New Jersey's action in implementing land use and zoning laws (the CAFRA process) cannot be imputed to the United States, and that New Jersey's refusal of a consistency determination also cannot be imputed. Although not expressed directly, defendant is apparently reasoning as follows: 1) New Jersey created the impediment to development because it denied the consistency determination and the CAFRA permits; 2) New Jersey's action cannot be imputed to the defendant; 3) therefore, defendant cannot be held liable for a taking. The court cannot accept the premises which underlie defendant's imputation argument, and therefore rejects it.

As discussed in Part II.B above, the record does not support defendant's suggestion that the State of New Jersey created the only impediment to development. The Corps' permit denial was independently supported by a merits-based determination that the proposed development would violate water quality standards.

Even if the court could conclude that New Jersey's action was the *sine qua non* for the permit denial, the court does not accept defendant's argument that this action cannot be imputed to the United States. Defendant correctly points out that § 401 of the Clean Water Act, 33 U.S.C. § 1341, requires that an applicant for a § 404 permit must either obtain prior state approval, or a waiver of state review. It is also correct that § 307 of the Coastal Zone Management Act, 16 U.S.C. § 1456(c)(3)(A), conditions grant of § 404 permits on obtaining a determination of consistency from the appropriate state coastal planning agency. Defendant appears to be contending that the presence of the state veto through the denial of the consistency determination and the denial of CAFRA permits is a *per se* defense to a federal taking. The court cannot accept such an assertion where, as here, the federal government retains independent control over its own regulatory action. While successful completion of the permitting process in this instance does require state approvals, it was Congress which created that statutory framework. Moreover, the process for obtaining a permit under § 404 begins and ends with the Corps.

The cases cited by defendant do not support its argument because they do not describe a federal-state relationship like the one here. In *Custom Contemp. Homes v.*

---

management policies, 33 C.F.R. § 325.2(b)(2)(ii), the Secretary can only issue the permit over the state's objections if he or she "determines that the proposed activity is consistent with the purposes of the CZM Act [the CZMA] or is necessary in the interest of national security." Plaintiffs project is not consistent with the CZMA, as the Corps itself found. The court is also persuaded that plaintiff's development plans are not in the interest of national security and that an appeal on that basis would have been pointless.

**12.** Whether there would be a taking if the Corps declined to consider the permit application solely because the state had, in a final decision, decided not to give the necessary authorization is not before the court. Some state approvals are incorporated directly into federal permitting procedure. *E.g.,* § 401 of the Clean Water Act, 33 U.S.C. § 1341; § 307(c)(3) of the CZMA, 16 U.S.C. § 1456(c)(3)(A). In part III below, the court considers the significance of the requirement of state approval when it addresses defendant's "imputation" argument. The court notes that the Department of Army's new regulations contemplate refusal of a permit solely for lack of state authorization. 33 C.F.R. § 320.4(j) (1988) (if a state does not give approval, the Corps should either: 1) immediately deny the permit without prejudice; 2) continue the process and decide the permit is against national interest; or 3) continue the process and deny the permit without prejudice, indicating that if the required authorization were obtained, the permit, under appropriate conditions, could be granted).

*United States,* 5 Cl.Ct. 88 (1984), for example, the court held that New Jersey's actions in condemning land for use in highway construction was not imputable to the Government, despite the use of federal monies. The court focused there on the complete lack of federal involvement in the condemnation process. Thus *Custom Contemp. Homes* is inapposite.

Other cases cited by defendant also miss the mark. In *De–Tom Enterprises v. United States,* 213 Ct.Cl. 362, 365, 552 F.2d 337, 339 (1977), the court recites, as defendant points out, that "the Government can only be held responsible for a Fifth Amendment taking when its own regulatory function is so extensive or intrusive as to amount to a taking...." The court went on to find, however, that it was zoning action by a local county board of supervisors which accounted for the diminution in value, not federal regulation. Plaintiff there was not seeking a federal permit. The regulatory action in question was exclusively non-federal. Similarly, in *Hendler v. United States,* 11 Cl.Ct. 91 (1986), the court held that a grant-in-aid program for financing construction of wells did not convert state operation of the wells into federal action. In *Mesa Ranch Partnership v. United States,* 2 Cl.Ct. 700 (1983), the partnership claimed that the federal government had taken the value of its coastal property in three ways: 1) through efforts of federal personnel to persuade local officials to "down zone" the parcel; 2) by designating the land as National Seashore on a map; and 3) by telling the partnership that it would acquire the land at some future date. There had been no application for a federal permit. The court pointed to the substantial state and local regulatory action which affected the site, and in that context held, "to the extent that plaintiff's development plans may have been inhibited by state and county action, such action is not attributable to the United States." 2 Cl.Ct. at 711. These cases do not assist defendant since there was no independent federal regulatory action which was alleged to constitute a taking. They are merely reflective of the holding of *Griggs v. Allegheny County,* 369 U.S. 84,

82 S.Ct. 531, 7 L.Ed.2d 585 (1962), that generalized federal involvement in a regulatory process is not a sufficient basis for exonerating the local regulatory authority of a taking.

In sum, while defendant is arguably correct when it contends that the state or local government is responsible for its own action, the same can be said of the federal government's responsibility for its actions.

It is also worth noting, though not determinative, that the state taking claim was rejected on the ground that there was federal preemption. If indeed the effect of the federal and state actions was to destroy the value of the land, defendant contends, in effect, that plaintiffs have no remedy. Assuming that no economically viable use remains for the property, the Constitution could not countenance a circumstance in which there was no fifth amendment remedy merely because two government entities acting jointly or severally caused a taking. Without assuming that the state court determination was correct, this court holds that plaintiffs can maintain the present action. The § 404 permit process is a federal one, and the permit denial stated an independent, merits-based ground for rejecting the application. As discussed above, even if the state had given a green light to development, the record reflects that the § 404 permit still would have been denied.

### D. *The Nuisance Exception*

Defendant argues that plaintiffs' claim fails on the merits. Pointing to the district court's findings in *Ciampitti I,* defendant urges that plaintiffs are collaterally estopped from denying that their proposed development constitutes an environmental health hazard. Defendant argues that the serious health effects associated with plaintiffs' proposal brings it within the so called "nuisance exception" to the fifth amendment taking clause.

■■■ As noted earlier, the Supreme Court has never been able to arrive at a set formula for analyzing takings cases. *See, e.g., Keystone Bituminous Coal Ass'n, v. DeBenidictis,* 480 U.S. 470, 495, 107 S.Ct.

1232, 1247, 94 L.Ed.2d 472 (1987), *citing Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). Instead, the Court proceeds with an *ad hoc* analysis involving three factors—the character of the government activity, the degree of impairment of investment-backed expectations, and the extent of the diminution in property value. Defendant asserts, citing *Keystone, Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), *Euclid v. Ambler*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), that when the Supreme Court has considered takings claims where the "character of the government purpose" was to eliminate a public nuisance or serious threat to public health, the Court has found no taking. Defendant also argues, citing *Keystone* 480 U.S. at 489–91, 107 S.Ct. at 1244–45, that there can be no property interest—no reasonable expectation—in creating a nuisance.

Certainly "the public interest in preventing activities similar to public nuisances is a substantial one, . . . ." *Keystone*, 480 U.S. at 492, 107 S.Ct. at 1246. The character of government action is therefore of particular significance when the Government is regulating a nuisance. The court is not convinced, however, that the character of governmental action is of such significance in the nuisance context that the economic impact of a regulation on a plaintiff's land can be ignored. As the Court reminds in *Agins v. Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980), the question of whether there is a taking "necessarily requires a weighing of private and public interests." Even the cases which defendant cites do not involve situations where the property owner is left with land having absolutely no value. Indeed, as Justice Rehnquist notes in his dissent in *Keystone*, the nuisance exception has *never* been used to deny compensation where the entire value of the property in question has been taken. 480 U.S. at 513, 107 S.Ct. at 1256–57.

The court concludes that the nuisance exception cannot be viewed in isolation. Assuming, *arguendo*, that plaintiffs' proposed activity does amount to a nuisance,[13] this court would still be required to at least examine the economic impact of the regulation and its interference with reasonable investment backed expectations. Because facts relating to the economic impact of the permit denial are in dispute, the court cannot rely on defendant's nuisance argument to grant summary judgment. The court notes, moreover, that defendant has not cited any decisions in which the § 404 permitting process has been analyzed in the nuisance context, much less any cases in which a court has granted summary judgment on that ground.[14]

### E. Investment Backed Expectations

Pointing again to findings of the district court in *Ciampitti I*, defendant insists that plaintiffs knew of state and federal permitting requirements, and therefore could not have had a reasonable investment backed expectation to develop their property in Diamond Beach without first obtaining per-

13. Principles of collateral estoppel would seem to bar plaintiffs from controverting any of the relevant findings made by the district court in *Ciampitti I. See, e.g., Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (fundamental to common law is the notion that an issue once determined by a competent court is conclusive); *McLaughlin v. Bradlee*, 803 F.2d 1197 (D.C.Cir.1986) (lists five requirements for application of collateral estoppel).

14. Two cases which have addressed regulatory takings in the § 404 context seem in fact to suggest that the nuisance argument would not apply. In *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893, 904 (Fed.Cir.1986), *cert. denied* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), the Federal Circuit conducted a weighing of private and public interests, and stated that "[t]his appears to be a situation where the balancing of public and private interests reveals a private interest more deserving of compensation. . . ." The Claims Court in *Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 381, 389 (1988), addressing a regulatory taking in the § 404 context, found that the public interest in preserving wetlands did not outweigh the private interest in developing housing. While each case admittedly turns on its own facts, these cases suggest that a § 404 permit denial is not necessarily analyzed as the prevention of a nuisance for which no compensation can be recovered.

mits. Absent these reasonable investment backed expectations, defendant contends that plaintiffs cannot demonstrate a compensable taking.

Defendant's argument springs from the Supreme Court's recitation in *Keystone,* 480 U.S. 470, 107 S.Ct. 1232, that a critical element in a takings analysis is whether an owner has reasonable investment backed expectations to develop the property at issue. The specific language is familiar:

> [T]his Court has generally "been unable to develop any 'set formula' [for analyzing takings cases]...." Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance. *Kaiser Aetna v. United States,* 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332] (1979) (citations omitted).

**15.** Defendant also discusses the "well-established" principle in eminent domain that just compensation cannot be predicated upon uses which are conjectural or speculative. The question of how just compensation is to be determined, however, only arises once a taking is established.

**16.** In reaching its conclusion, defendant has perhaps misconstrued the line of cases in which the Supreme Court has denied takings claims on the "grounds that while the challenged governmental action caused economic harm, it did not interfere with interests that were sufficiently bound up with reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Penn Central Transp. Co v. New York,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), *reh. denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978), *citing United States v. Willow Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945); *Demorest v. City Bank Co.,* 321 U.S. 36, 64 S.Ct. 384, 88 L.Ed. 526 (1944); *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *Muhlker v. Harlem R. Co.,* 197 U.S. 544, 25 S.Ct. 522, 49 L.Ed. 872 (1905). These cases stand for the proposition that a property owner cannot reasonably expect that every conceivable interest in property, however remote, will be protected as "property" by the fifth amendment. Thus in *United States v.*

*Keystone* at 495, 107 S.Ct. at 1247. Drawing on this language, the defendant concludes that "it is only reasonable expectations that weigh in the constitutional balance," Defendant's Motion and Memorandum in Support of Motion for Summary Judgment at 32, and urges that plaintiffs' claim must therefore be dismissed.[15]

*Keystone* suggests that the reasonable investment backed expectations analysis is but one of three relevant inquiries. While knowledge about permitting difficulties may indeed weigh against plaintiffs in this case, that is certainly not the only factor to consider in the constitutional balance.[16]

The court concludes that in analyzing plaintiffs' claim, it must address all three of the factors which the Supreme Court has identified as relevant. Addressing them will involve factual inquiries which preclude summary judgment.[17]

### F. *The Relevant Tract*

█ In deciding whether a particular government action has effected a taking, the court must focus on interference with

*Willow River Power Co.,* the Court held that the plaintiff's interest in the high water level of a river for runoff to provide power was not a property interest. *See also Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1983) (no property interest in excluding demonstrators from shopping center). While these cases suggest that not every interest in property is protected, the term "property" in the fifth amendment is a broad one. *See United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945) (the term property as used in the Takings Clause "denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.... The constitutional interest is addressed to every sort of interest the citizen may possess."). Plaintiffs' interest is to develop their property for housing. Such an interest certainly is protected by the fifth amendment as "property." *See, e.g., Florida Rock,* 791 F.2d 893; *Loveladies,* 15 Cl.Ct. 381.

**17.** In addition to the question of economic impact, there are material facts in dispute relating to investment backed expectations, such as whether the purchase price of plaintiffs' property took account of the necessity for state or federal permits and the attendant risk of possible denials, and the degree to which plaintiffs should have anticipated difficulties with the permit process at the time of purchase.

rights in the parcel as a whole. As the Supreme Court noted in *Penn Central:* " 'Takings' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." 438 U.S. at 130, 98 S.Ct. at 2662. Critical to the outcome of this case, therefore, is what tract of land the court should consider when looking at loss in value. *See Keystone,* 480 U.S. at 497, 107 S.Ct. at 1248.

The circumstances surrounding plaintiffs' acquisition of their Diamond Beach property are complicated, with many different, though related, parties involved in many transactions during a six year period between 1980 and 1986. Plaintiffs and defendant are directed to submit separate status reports on or before November 30, 1989, advising whether the issue of what consitutes the whole parcel for purposes of determining economic impact can be resolved prior to trial.

### III.  CONCLUSION

Defendant's motion for summary judgment is denied. The property which was not included in plaintiffs' permit application is dismissed from the action. Plaintiffs are directed to amend their complaint on or before November 30, 1989 to reflect this dismissal, as well as to delete plaintiffs dropped from the suit and to correct the spelling of plaintiff Ciampitti's name.